## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## MOBILE DIVISION

RACHAEL DEMARCUS and ALEXIS
SILVER, CAITLIN TIPPING, MEAGHAN
JONES, HANNAH KAZEE, HANNAH
JOHNSON, HANNAH MADDUX, and
MADDIE SOBOLESKI

　　　　　　　　　　*Plaintiffs*,

*vs.*

UNIVERSITY OF SOUTH ALABAMA,
ALEXIS MEEKS-RYDELL, JOEL
ERDMANN, ROB CHILCOAT, PATRICIA
GANDOLFO, JINNI FRISBEY, and CHRIS
MOORE

　　　　　　　　　　*Defendants*.

Civil Action No. 1:21-CV-0380-KD-B

**SECOND AMENDED COMPLAINT and
DEMAND FOR JURY TRIAL**

## SECOND AMENDED COMPLAINT

Plaintiffs Rachael DeMarcus ("DeMarcus"), Alexis Silver ("Silver"), Caitlin Tipping ("Tipping"), Meaghan Jones ("Jones"), Hannah Kazee ("Kazee"), Hannah Maddox ("Maddux")[1], and Maddie Soboleski ("Soboleski")[2] (together, "Plaintiffs"), by and through undersigned counsel, hereby file this Second Amended Complaint[3] ("Complaint") against Defendants University of South Alabama (the "University"), Alexis Meeks-Rydell ("Meeks-Rydell"), Joel Erdmann ("Erdmann"), Rob Chilcoat ("Chilcoat"), Patricia Gandolfo ("Gandolfo"), Jinni Frisbey ("Frisbey"), and Chris Moore ("Moore") (together, "Defendants"), alleging as follows:

---

[1] Plaintiff Hannah Maddux was previously identified in Plaintiffs' First Amended Complaint as Jane Doe 1.
[2] Plaintiff Maddie Soboleski was previously identified in Plaintiffs' First Amended Complaint as Jane Doe 2.
[3] Plaintiffs' Second Amended Complaint is filed pursuant to the Court's February 8, 2022 Order Denying Plaintiffs' Motion for Leave to Proceed Anonymously and ordering Plaintiffs to amend their Complaint by February 22, 2022 to include the identities of the Jane Doe Plaintiffs. Other than identifying the Jane Doe Plaintiffs, Plaintiffs' Second Amended Complaint is identical to their First Amended Complaint.

## **INTRODUCTION**

1.      This is a case that involves a pattern and practice of blatant sexual harassment and sexual and other physical and emotional assault by Defendant Meeks-Rydell during her time as the Head Coach of the University of South Alabama women's volleyball team (the "Volleyball Team" or "Team").  This activity, pattern and practice took place from January 1, 2019 through the 2019-2020 academic school year at the University, and in connection with University-sanctioned wrongful conduct, Defendant Meeks-Rydell was acting in her capacity as Head Coach of the University women's Volleyball Team.

2.      Between 2018 and 2020, Plaintiffs matriculated at the University of South Alabama with the express promise of a prestigious Division I volleyball career and competitive academic opportunities.  However, Plaintiffs' athletic and academic aspirations were negatively, severely and irreparably impacted, damaged and ruined by the misconduct of the women's volleyball Head Coach, Defendant Meeks-Rydell; Assistant Coaches, Defendants Chilcoat and Gandolfo; Athletic Director, Defendant Erdmann; Associate Athletic Directors, Defendants Frisbey and Moore; and the University's facilitation and ratification of her conduct. Plaintiff's athletic and academic aspirations were also negatively, severely and irreparably impacted, damaged and ruined by the University's decision to ignore Defendant Meeks-Rydell's relentless and pervasive pattern of harassment and physical, psychological, and emotional abuse, in addition to other wrongful acts by the Defendants.

3.      Defendant Meeks-Rydell physically abused Plaintiffs by inappropriate touching, including unwanted pinching of Plaintiffs' buttocks, and overtraining, intimidating and coercing players to continue to practice or play while injured. Defendant Meeks-Rydell used psychological and emotional manipulation and intimidation, among other tactics, to leverage and abuse her

position of power and authority over Plaintiffs and other Volleyball Team members. At the hands

of Defendant Meeks-Rydell, Plaintiffs suffered harassment and abuse so severe that they not only

suffered physical and psychological issues, but were left without any choice but to abandon their

athletic and academic careers at the University of South Alabama.

4.      Defendant Meeks-Rydell's relentless and pervasive pattern of harassment and

abuse occurred in violation of federal and state laws, as well as in violation of National Collegiate

Athletic Association ("NCAA") regulations established to protect student-athletes' educational

opportunities outside of their chosen sport. The University had a duty to protect its students from

such abuse and the University failed to do so. The University knew of Defendant Meeks-Rydell's

misconduct, through its officials and agents who were in positions to remedy the circumstances,

and refused to act to protect Plaintiffs and other student athletes. The University acted with

deliberate indifference to Defendant Meeks-Rydell's actions and the abuse to which Plaintiffs were

subject. As a result of the University's actions and failures to act, Plaintiffs were deprived of their

enjoyment of educational opportunities and programs to which they were entitled as student-

athletes at the University of South Alabama.

5.      The allegations herein are made upon knowledge of the Plaintiffs and, as to all other

matters, upon information and belief gained from investigation undertaken by Plaintiffs' counsel.

6.      Plaintiffs further complain and allege as follows:

## **PARTIES**

7.      Plaintiff Rachael DeMarcus is a 21-year-old student at the University of Louisville,

and she is a citizen of the Commonwealth of Kentucky. She matriculated at the University of

South Alabama in 2018 on a full scholarship and began playing for the University's Volleyball

Team that fall under the coaching staff in place prior to Defendant Meeks-Rydell's arrival.  Due to Meeks-Rydell's pervasive harassment and abuse, DeMarcus transferred from the University.

8.      Plaintiff Alexis Silver is a 22-year-old citizen of the State of Washington.  Silver matriculated at the University in 2018 and began playing for its Volleyball Team in 2018.  She transferred from the University in 2019 and no longer plays volleyball.

9.      Plaintiff Caitlin Tipping is a 21-year-old citizen of Canberra, Australia.  Tipping matriculated at the University in 2019 and began playing for its Volleyball Team in 2019.  She left the University in 2020.

10.      Plaintiff Meaghan Jones is 22-year-old citizen of Mobile, Alabama.   Jones matriculated at the University in 2017 and began playing for its Volleyball Team in 2017.  She left the University in 2020.

11.      Plaintiff Hannah Kazee is a 20-year-old citizen of Mobile, Alabama. Kazee matriculated the University in 2020 and began playing for its Volleyball Team in 2020.

12.      Plaintiff Hannah Johnson is a 23-year-old citizen of Ingleside, Illinois.  Johnson matriculated the University in 2017 and began playing for its Volleyball Team in 2017.  Johnson left the University in 2020.

13.      Plaintiff Hannah Maddux is 20-year-old citizen of Mobile, Alabama.  Hannah Maddux matriculated the University in 2019 and began playing for its Volleyball Team in 2019.

14.      Plaintiff Maddie Soboleski is 21-year-old citizen of Mobile, Alabama.  Maddie Soboleski matriculated the University in 2020 and began playing for its Volleyball Team in 2020.

15.      Defendant University of South Alabama is a government entity and public university, located in Mobile, Alabama. The University is a recipient of federal funds under Title IX, 20 U.S.C. §§ 1681-1688 ("Title IX").

16.     Defendant Alexis Meeks-Rydell was, at all relevant times hereto, a resident citizen of Mobile County, Alabama, where she was employed by the University as head coach of the University's women's volleyball team.  Meeks-Rydell resigned from the University in February 2021.  Meeks-Rydell is being sued in her individual capacity and, as to claims seeking declaratory and injunctive relief, in her official capacity as an agent and/or employee of the University.

17.     Defendant Joel Erdmann was, at all relevant times hereto, a resident citizen of Mobile County, Alabama, where he was, and still is, employed by the University as Athletic Director.

18.     Defendant Jinni Frisbey was, at all relevant times hereto, a resident citizen of Mobile County, Alabama, where he was, and still is, employed by the University as Senior Associate Athletic Director.

19.     Defendant Chris Moore was, at all relevant times hereto, a resident citizen of Mobile County, Alabama, where he was, and still is, employed by the University as Associate Athletic Director.

20.     Defendant Rob Chilcoat was, at all relevant times hereto, a resident citizen of Mobile County, Alabama, where he was employed by the University as an Assistant Coach of the Volleyball Team.

21.     Defendant Patricia Gandolfo was, at all relevant times hereto, a resident citizen of Mobile County, Alabama, where she was employed by the University as an Assistant Coach of the Volleyball Team.

## JURISDICTION AND VENUE

22.     This action is filed pursuant to 42 U.S.C. § 1983 and 20 U.S.C. § 1681, *et seq*. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

23.     This action also claims violations of Alabama state law.  As these claims are so related to the claims under federal law that they form part of the same case and controversy, this Court has supplemental jurisdiction to hear the Alabama state law claims pursuant to 28 U.S.C. § 1367(a).

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and other applicable law, as the causes of action arose primarily in Mobile County, Alabama, which is situated within the district and divisional boundaries of the Southern District of Alabama, Mobile Division.

## FACTS

## I.      THE UNIVERSITY'S WOMEN'S VOLLEYBALL COACHING STAFF

25.     Defendant Meeks-Rydell was hired as the University's Women's Volleyball Team Head Coach on December 31, 2018.

26.     Due to known inappropriate conduct of coaches and/or assistant coaches from the previous coaching regime, Defendant Frisbey promised members of the Volleyball Team that she would supervise the transition into Coach Meeks-Rydell's coaching regime to ensure that there would be no inappropriate conduct.

27.     On or about February 26, 2021, the University announced Defendant Meeks-Rydell was resigning as Head Coach of the Women's Volleyball Team.

28.     Purdue University Fort Wayne, a University in Fort Wayne, Indiana hired Defendant Meeks-Rydell on June 1, 2021.  Purdue University Fort Wayne placed Meeks-Rydell on administrative leave in September 2021.

29.     As Head Coach of the University's Volleyball Team, Defendant Meeks-Rydell had full authority to manage the Team, including scheduling training, practice, travel, and meetings, and arrange who would play in games. She also had complete authority to manage the team roster,

6

including offering players positions on the University's Women's Volleyball Team as well as cut members from the team.

30.     According to information and belief, the rest of the coaching staff for the University's women's Volleyball Team, at all relevant times, consisted of two assistant coaches – Defendants Rob Chilcoat and Patricia Gandolfo. Both Defendants Chilcoat and Gandolfo had the authority to take corrective action in the event of wrongful or illegal conduct directed at the Plaintiffs.

31.     Assistant Coach Defendant Rob Chilcoat, prior to joining the University coaching staff in January 2019, worked with Defendant Meeks-Rydell for three seasons, coaching women's volleyball at the University of West Alabama from 2016 to 2018.[4]

32.     Assistant Coach Defendant Patricia Gandolfo coached women's volleyball since 2010, and she joined the University's coaching staff in May 2019.[5]

## II.     MEEKS-RYDELL'S ABUSIVE COACHING TACTICS

33.     As Head Coach of the women's Volleyball Team, Meeks-Rydell held a position of authority among the Volleyball Team members, including Plaintiffs.  As Head Coach, Defendant Meeks-Rydell controlled team membership, positions, playing time and the power to grant or withhold lucrative scholarships for members of the Volleyball Team.

34.     Beginning in or about January 2019, Defendant Meeks-Rydell had nearly constant contact with members of the Volleyball Team, including Plaintiffs.  Defendant Meeks-Rydell supervised the Volleyball Team during daily practices, hosted numerous mandatory social gatherings for team members, and made frequent after-hours contact with team members via telephone, text messages, and/or internet messaging.

---

[4] https://usajaguars.com/sports/womens-volleyball/roster/2019 (last visited Dec. 17, 2021).
[5] https://usajaguars.com/sports/womens-volleyball/roster/2020 (last visited Dec. 17, 2021).

35.    Defendant Meeks-Rydell created a climate of fear and intimidation among the Volleyball Team while she was the Head Coach, including engaging in a pattern and practice of physical, verbal, and psychological abuse to the Volleyball Team and Plaintiffs individually.

36.    Defendant Meeks-Rydell swore at Plaintiffs and regularly made abusive comments to Plaintiffs such as "we're losing because of you," "get the fuck out," and "if you can't fucking do it, then don't do anything at all" when Plaintiffs were injured.

37.    Defendant Meeks-Rydell also told Plaintiffs that her personal problems were caused by the Plaintiffs' failures as a Volleyball team.  For example, Defendant Meeks-Rydell told Plaintiffs that:

  a.   Plaintiffs and the Volleyball Team caused her to contract cancer;

  b.   Plaintiffs and the Volleyball Team caused her marital problems;

  c.   Plaintiffs and the Volleyball Team were going to cause Meeks-Rydell to lose her job.

38.    Defendant Meeks-Rydell used the above listed tactics, among others, to create and foster a hostile and toxic environment for Plaintiffs and the Volleyball Team.

39.    Defendant Meeks-Rydell threatened Volleyball Team members, including Plaintiffs, who she thought may transfer.

40.    Defendant Meeks-Rydell ridiculed Volleyball Team, including Plaintiffs, who were injured, accusing them of faking injuries and forcing them to play through serious medical conditions, including asthma attacks, ankle sprains, knee injuries, head injuries, and concussions, among others, sometimes resulting in permanent injuries resulting from improper rehabilitation.

41.    Defendant Meeks-Rydell used methods disallowed by the NCAA to punish Plaintiffs.

42.     Among the punishments imposed upon Plaintiffs were "breakfast clubs." Breakfast clubs consisted of forcing the Volleyball Team and Plaintiffs to arrive at the gym as early as 4:00 a.m., where Defendant Meeks-Rydell would force the players to run and do other physical drills until the players vomited, passed out, or cried due to inability to continue.

43.     Typically, Defendant Meeks-Rydell would send a text late at night to the players who would be subjected to a "breakfast club" the next day, causing those players extreme stress, anxiety, sleeplessness, and distress.

44.     Defendant Meeks-Rydell routinely required the players to be at the gym as early as 4:00 a.m. for practice in violation of the NCAA Bylaws relating to permitted practice times.[6]

45.     In addition to the physical, verbal, and psychological abuse. Defendant Meeks-Rydell also physically groomed and touched Plaintiffs and other volleyball players, and engaged in physical conduct rising to the level of sexual harassment and/or assault.

46.     For example:

   a.   Whenever the Volleyball Team travelled for games, Defendant Meeks-Rydell would pinch players' butts, including Plaintiffs, as they exited the bus;

   b.   Defendant Meeks-Rydell slapped Volleyball Team members, including Plaintiff Rachael DeMarcus specifically, in the face;

   c.   Defendant Meeks-Rydell forced Volleyball Team members, including Plaintiffs, into "floor hugs" where she would force the Team members to lay on the ground while she laid on top of Plaintiffs and other Volleyball Team members;

---

[6] NCAA Bylaw 17.1.7.11.6.1, effective 8/1/2017, states "Required athletically related activities other than competition (and associated activities) shall not occur during a continuous eight-hour period between 9 p.m. and 6 a.m." *See* https://web3.ncaa.org/lsdbi/reports/getReport/90008

d. Defendant Meeks-Rydell forced Plaintiffs and Volleyball Team members to hug her and tell her that they loved her;

e. Defendant Meeks-Rydell forced Volleyball Team members and Plaintiffs individually to constantly tell her that they love her in text messages and in person;

f. If Defendant Meeks-Rydell perceived that was not getting enough positive attention from her players and Plaintiffs individually, she would punish them by subjecting the Plaintiffs to emotional and/or verbal abuse, limit their ability to play in games, or by making the Team and Plaintiffs participate in intense physical punishment such as breakfast clubs.

47. Several University officials had direct knowledge of Defendant Meeks-Rydell's abusive conduct listed above, including but not limited to Defendants Erdmann, Frisbey, Moore, Chilcoat, and Galdolfo. Several University officials had the authority to take corrective action in the event of wrongful or illegal conduct directed at the Plaintiffs, including but not limited to Defendants Erdmann, Frisbey, Moore, Chilcoat, and Galdolfo.

48. Players, including Plaintiffs, were constantly, consistently and repeatedly getting injured on the team, and Defendant Meeks-Rydell would force the Players to play with serious injuries. Meeks-Rydell would also conspire to conceal Plaintiffs' injuries from the school trainers so the Plaintiffs would remain eligible to play. Defendants Erdmann, Frisbey, Chilcoat, and Galdolfo conspired with Defendant Meeks-Rydell to conceal said injuries and/or knowingly ratified by the concealment of said injuries.

49. Defendant Meeks-Rydell abused and belittled Volleyball Team members, including Plaintiffs, who were hurt and would coerce and/or force them to play through their injuries.

10

50.     Defendant Meeks-Rydell resigned from her position at the University on or about February 26, 2021.

### III.     ADDITIONAL FACTS SPECIFIC TO PLAINTIFFS

#### a.   Plaintiff Rachael DeMarcus

51.     Paragraphs 1 through 50 are incorporated herein as if set forth in full.

52.     Plaintiff Rachael DeMarcus endured significant verbal, emotional, physical, and/or sexual harassment during her time at the University as a result of the wrongful conduct of Defendant Meeks-Rydell.

53.     In addition to the physical abuse and harassment alleged above, Defendant Meeks-Rydell attempted to form an inappropriate relationship with Plaintiff DeMarcus, and would verbally abuse and/or sexually harass Plaintiff DeMarcus.

54.     Defendant Meeks-Rydell routinely became angry at Plaintiff DeMarcus for not reciprocating the type of relationship Defendant Meeks-Rydell sought with Plaintiff DeMarcus. For example:



55.     This would also result in inappropriate and harassing texts from Meeks-Rydell, including Defendant Meeks-Rydell demanding Plaintiff DeMarcus to have a relationship with

Defendant Meeks-Rydell and to tell Meeks-Rydell that she loves her, as exemplified in the below exchanges:











To: Coach Meeks                                                                    Details

9/30/19, 8:17 PM

Keep grinding through the ugly. We all have days were we feel like we can't set. But I'm telling you if you keep playing defense like this you're going to be unstoppable.

yes ma'am 👍

Do you still love me?

of course ❤️ i just hate disappointing you:(

Oh my gosh babe. I will never be disappointed in you unless you stop trying. I am proud of you every day. You have to know I am going to be harder on you than everyone else and there are days where I am going to be upset but never disappointed.

Yes ma'am I appreciate you so much for doing that and being tough on me. Thank you. I will do better!

To: Coach Meeks                                                                    Detail

10/25/19, 1:55 PM

We going to be friends today?

yes ma'am!

10/26/19, 2:19 PM

I think we should talk before the match today. Whatcha think?

yes ma'am!

I'll be there around 3:30 and I'll come grab you.

okay

10/26/19, 10:11 PM

Just want to say it again. I am so sorry for hurting you. I love you so much.

10/26/19, 11:25 PM

Thank you again. I love you ❤️❤️❤️

14



56.     On August 18, 2019, the final day of preseason training before the season, Plaintiff DeMarcus suffered a high ankle sprain, requiring her to wear a stabilizing boot and use crutches. Despite a physician-recommended healing time of 4-6 weeks, Defendant Meeks-Rydell insisted that Plaintiff DeMarcus play in the first game of the season on August 30, 2019, telling Plaintiff DeMarcus that she has to play if she wants to win, and further instructing Plaintiff DeMarcus not to inform the athletic trainer of the severity of the ankle strain. Ultimately, Plaintiff DeMarcus was not physically cleared to play in the August 30, 2019 game.

57.     On August 31, 2019, Defendant Meeks-Rydell approached Plaintiff DeMarcus in the Hartsfield-Jackson Atlanta International Airport, prior to boarding their flight back to Mobile,

Alabama, and slapped Plaintiff DeMarcus across her face – presumably in retaliation for being honest with the athletic trainer about her ankle injury.

58.    Defendants Chilcoat and Gandolfo, as well as other Volleyball Team members and staff, witnessed Defendant Meeks-Rydell strike Plaintiff DeMarcus.

59.    Additionally, Defendant Meeks-Rydell manipulated and/or forced Plaintiff DeMarcus to spend money on purchasing coffee and other items for Defendant Meeks-Rydell. For example:



60.    On September 14, 2019, the Team played in a tournament at Kennesaw State University.

61.    During the first game, Plaintiff DeMarcus was struck in the back of the head by another player's knee, causing her to partially lose consciousness, become dizzy, and lose her balance. Plaintiff DeMarcus's eyes watered because of the impact, and she informed Defendant Meeks-Rydell that she could not see well and that she was dizzy.

62.    Instead of complying with University and NCAA concussion protocol, Defendant Meeks-Rydell ordered Plaintiff DeMarcus to refrain from informing the Team athletic trainer about the injury because the trainer would require that Plaintiff DeMarcus refrain from playing for a number of weeks, as was required by concussion protocol. Defendant Meeks-Rydell further

emphasized her desire to win the game and instructed Plaintiff DeMarcus to play despite her head injury.

63.    Throughout the game, Defendant Meeks-Rydell interfered with attempts of the athletic trainer to assess Plaintiff DeMarcus for a concussion determination.

64.     In the days following the game, the Team athletic trainer informed Plaintiff DeMarcus that she had suffered a severe concussion.

65.    As a result of the concussion, Plaintiff DeMarcus suffered, among other conditions, impaired vision, constant headaches, and a severe loss of appetite.

66.    Shortly after Defendant Meeks-Rydell began her abusive coaching tactics, Plaintiff DeMarcus developed symptoms of Supra Ventricular Tachycardia ("SVT"), including shortness of breath, chest pain, and an accelerated heartbeat.

67.    Despite the concerns of Team physicians, Defendant Meeks-Rydell coerced and/or forced Plaintiff DeMarcus to engage in breakfast clubs, practice, and games despite the development of symptoms of SVT.

68.    Plaintiff DeMarcus was unable to continue playing volleyball because of the severity of the SVT, and due to the abuse and harassment imposed by Defendant Meeks-Rydell.

69.    Due to the stress-induced severity of her SVT, Plaintiff DeMarcus was required to undergo significant testing, wear heart monitors, and take a break from volleyball, and ultimately underwent an ablation procedure to address the SVT. All of these events which resulted from the Defendants' wrongful conduct caused further mental, emotional, and physical trauma.

70.    Throughout Plaintiff DeMarcus's term with the Volleyball Team, as a result of the Defendants' wrongful conduct, she suffered daily from anxiety and depression.

71.     As a result of the persistent and wrongful conduct to which Plaintiff DeMarcus, was subjected, and which resulted in mental, emotional and physical injury, she was forced to leave the University and to leave the Volleyball Team.

72.     On December 3, 2019, Plaintiff DeMarcus informed Defendant Meeks-Rydell that she was transferring out of the University.

73.     Plaintiff DeMarcus still suffers from severe emotional distress as a result of the abuse and harassment she suffered due to Defendants' wrongful conduct while attending the University.

### b.  **Plaintiff Alexis Silver**

74.     Paragraphs 1 through 73 are incorporated herein as if set forth in full.

75.     Plaintiff Alexis Silver endured significant verbal, emotional, physical, and/or sexual harassment during her time at the University as a result of the wrongful conduct of Coach Meeks-Rydell.

76.     Plaintiff Silver was routinely subjected to the allegations above, including but not limited to breakfast clubs in the early mornings, forced full body contact with Defendant Meeks-Rydell, and extensive and demeaning verbal harassment.

77.     As a result of the abuse endured during this time, Plaintiff Silver suffered daily panic attacks, and suffered a 40 pound weight loss in one semester.

78.     As a result of the persistent wrongful conduct Plaintiff Silver was subjected, and which resulted in mental, emotional and physical injury, Plaintiff Silver was forced to leave the University and to leave the Volleyball Team. Plaintiff Silver still suffers from severe emotional distress as a result of the abuse and harassment she suffered due to Defendants' wrongful conduct while attending the University.

### c. __Plaintiff Caitlin Tipping__

79.     Paragraphs 1 through 78 are incorporated herein as if set forth in full.

80.     Plaintiff Caitlin Tipping endured significant verbal, emotional, physical, and/or sexual harassment during her time at the University under Defendant Meeks-Rydell.

81.     Plaintiff Tipping was subjected to butt pinching by Meeks-Rydell, forced hugs by Defendant Meeks-Rydell, forced into telling Defendant Meeks-Rydell "I love you," and witnessed other verbal, physical, emotional, and sexual harassment.

82.     Defendant Meeks-Rydell began verbally abusing Plaintiff Tipping as soon as Tipping arrived at the University, frequently swearing at Plaintiff Tipping.

83.     During training, Plaintiff Tipping suffered a leg injury that was later determined to include fracture and ligament damage.

84.     In spite of Plaintiff Tipping's pain and complaints, Defendant Meeks-Rydell forced Plaintiff Tipping back within a week.

85.     While being forced to play on a fractured leg and damaged ligaments, Defendant Meeks-Rydell would frequently abuse Plaintiff Tipping for playing poorly and "faking her injuries".

86.     As a result of the persistent wrongful conduct Plaintiff Tipping was subjected, and which resulted in mental, emotional and physical injury, Plaintiff Tipping was forced to leave the University and to leave the Volleyball Team.

87.     Upon learning that Plaintiff Tipping was compelled to withdraw from the Volleyball Team and the University due the wrongful conduct of the Defendants, Defendants Chilcoat, Moore, and Meeks-Rydell scheduled a meeting with Plaintiff Tipping in January 2020.

88.     During the January 2020 meeting, Defendants Chris Moore and Alexis Meeks-Rydell sought to intimidate Plaintiff Tipping by declaring that she would be fined over $6,000 (the "fine") for leaving the University.

89.     In order to perpetuate the abuse and conceal the wrongful and illegal from the NCAA – and therefore also out of the public eye – Defendants Moore and Meeks-Rydell convinced Plaintiff Tipping that they would take care of the alleged "fine" if Plaintiff Tipping penned a letter to the NCAA stating that she was leaving the University due to concerns about fires in Australia rather than the abuse she suffered as a result of Defendants' wrongful and illegal conduct.

90.     Pressured by Defendants Moore and Meeks-Rydell, and suffering under extreme emotional stress and fear imposed by Defendants Moore and Meeks-Rydell, Plaintiff Tipping was forced into providing a letter to the NCAA.

91.     Defendants' coercive efforts is evidenced, in part, the below screenshot text exchanges between Plaintiff Tipping and Defendants Chilcoat and Meeks-Rydell:







92.     As a result of the additional abuse endured during this time, Plaintiff Tipping suffered severe stress and anxiety.

93.     As a result of the persistent wrongful conduct Plaintiff Tipping was subjected, and which resulted in mental, emotional and physical injury, Plaintiff Tipping was forced to leave the University and to leave the Volleyball Team.

94.     Plaintiff Tipping still suffers from severe emotional distress as a result of the abuse and harassment she suffered due to Defendants' wrongful conduct while attending the University.

     **d.**  <u>**Plaintiff Meaghan Jones**</u>

95.     Paragraphs 1 through 94 are incorporated herein as if set forth in full.

96.     Plaintiff Meaghan Jones endured significant verbal, emotional, physical, and/or sexual harassment during her time at the University under Coach Meeks-Rydell.

97.     Defendant Meeks-Rydell pinched Plaintiff Jones' backside, forced Plaintiff Jones to hug her and required that Plaintiff Jones tell her, "I love you," and systematically witnessed other verbal, physical, emotional, and sexual harassment.

98.     Plaintiff Jones was routinely subjected to abuse, including but not limited to breakfast clubs, forced full body contact with Defendant Meeks-Rydell, and extensive and demeaning verbal harassment.

99.     Plaintiff Jones suffered a back injury shortly after Defendant Meeks-Rydell became the Head Volleyball Coach.

100.    Defendant Meeks-Rydell would routinely accuse Plaintiff Jones of faking her back injury and demean her in private and in front of other Team members, which humiliated and embarrassed Plaintiff Jones.

101.    Defendant Meeks-Rydell also accused Plaintiff Jones of faking asthma attacks, including one occasion that Defendant Meeks-Rydell forced Plaintiff Jones to run extra sprints for attempting to retrieve her inhaler during an asthma attack.  Defendant Meeks-Rydell did not let Plaintiff Jones use her inhaler on this occasion.

102.    As a result of the abuse endured during this time, Plaintiff Jones suffered severe stress and anxiety.

103.    As a result of the persistent wrongful conduct Plaintiff Jones was subjected, and which resulted in mental emotional and physical injury, Plaintiff Jones was forced to leave the University and to leave the Volleyball Team.

104.    Plaintiff Jones still suffers from severe emotional distress as a result of the abuse and harassment she suffered due to Defendants' wrongful conduct while attending the University.

**e.   Plaintiff Hannah Kazee**

105.    Paragraphs 1 through 104 are incorporated herein as if set forth in full.

106.    Plaintiff Hannah Kazee endured significant verbal, emotional, physical, and/or sexual harassment during her time at the University under Coach Meeks-Rydell.

107.    Defendant Meeks-Rydell pinched Plaintiff Kazee's backside, forced Plaintiff Kazee to hug her, and required that Plaintiff Kazee tell her "I love you." Plaintiff Kazee systematically witnessed other verbal, physical, emotional, and sexual harassment.

108.    Plaintiff Kazee was routinely subjected to the allegations above, including but not limited to forced full body contact with Defendant Meeks-Rydell, and extensive and demeaning verbal harassment.

109.    Shortly after arriving at the University, Plaintiff Kazee suffered from a back injury which was the result of a bulging disk developed through volleyball.

110.    Defendant Meeks-Rydell accused Plaintiff Kazee of faking her injury in front of Team members and demanded that Plaintiff Kazee play through her injury.

111.    The bulging disk eventually caused a nerve injury, causing Plaintiff Kazee to lose sensations in her lower extremities.

112.    Defendant Meeks-Rydell continued to accuse Plaintiff Kazee of faking her injury and having a poor work ethic.

113.    Defendant Meeks-Rydell also forced Plaintiff Kazee to hug her and to participate in other unwanted physical contact despite Plaintiff Kazee informing Defendant Meeks-Rydell that such contact made Plaintiff Kazee uncomfortable.

114.    When Plaintiff Kazee tried to avoid forced hugs or cover her butt to prevent Defendant Meeks-Rydell from touching her inappropriately, Defendant Meeks-Rydell would retaliate against Plaintiff Kazee through reduced playing time and psychological punishment.

115.    Defendant Meeks-Rydell, knowing that Plaintiff Kazee was taking anti-depressant medication at the time, would routinely refer to Plaintiff Kazee as "crazy" and would compare her to former players who Defendant Meeks-Rydell classified as "crazy". Defendant Meeks-Rydell's conduct caused Plaintiff Kazee great humiliation, embarrassment, and emotional distress.

116.    As a result of the wrongful conduct of the Defendants, Plaintiff Kazee suffered physical, mental and emotional injury, and any existing health conditions were directly and knowingly exacerbated.

117.    Defendant Meeks-Rydell encouraged Plaintiff Kazee to speak privately with her about her medical conditions, both mental and physical.  Despite assurances from Defendant Meeks-Rydell that these conversations would remain private, Defendant Meeks-Rydell would then publicly inform the entire Volleyball team of these confidential conversations.

118.    On one occasion, Plaintiff Kazee's medical condition, which was exacerbated by the emotional distress caused by Defendants' wrongful conduct, left Plaintiff Kazee unable to walk on the volleyball court.

119.    In response to Plaintiff Kazee's cries and responses to pain, Defendants Meeks-Rydell and Chilcoat yelled at Plaintiff Kazee and instructed her to leave the gym.

120.    Plaintiff Kazee's mother presented and transported Plaintiff Kazee from the gym to a nearby hospital. Plaintiff Kazee was bedbound and unable to move for two weeks.

121.    Plaintiff Kazee, along with her parents, had a conference via Zoom with Defendant Frisbey and Defendant Meeks-Rydell in December of 2020. During this conference, Plaintiff

Kazee and her parents informed Defendant Frisbey of Defendant Meeks-Rydell's inappropriate conduct, in detail, towards Plaintiff Kazee and the Volleyball Team.

122.    Defendant Frisbey failed to take any corrective action

123.    Due to Defendants' conduct, Plaintiff Kazee was forced to withdraw from Volleyball Team at the University.

124.    As a result of the abuse endured during this time, Plaintiff Kazee suffered severe stress and anxiety, in addition to physical trauma.

125.    Plaintiff Kazee still suffers from severe emotional distress and physical pain as a result of the abuse and harassment she suffered due to Defendants' wrongful conduct while attending the University.

    **f.    Plaintiff Hannah Johnson**

126.    Paragraphs 1 through 125 are incorporated herein as if set forth in full.

127.    Plaintiff Hannah Johnson endured significant verbal, emotional, physical, and/or sexual harassment during her time at the University under Coach Meeks-Rydell.

128.    Defendant Meeks-Rydell pinched Plaintiff Jones' backside, forced Plaintiff Johnson to hug her, and required that Plaintiff Johnson tell her "I love you." Plaintiff Johnson systematically witnessed other verbal, physical, emotional and sexual harassment.

129.    Plaintiff Johnson was routinely subjected to abuse, including but not limited to breakfast clubs, forced full body contact with Defendant Meeks-Rydell, and extensive and demeaning verbal harassment.

130.    In the Spring of 2019, Defendants Meeks-Rydell and Chilcoat instituted a practice drill whereby Defendant Chilcoat would spike balls towards the faces of Volleyball Team members.

131.    In February 2019, Plaintiff Johnson suffered a concussion after having a volleyball spiked into her head by Defendant Chilcoat during one of the above-mentioned drills.

132.    Following her concussion, Plaintiff Johnson's mother contacted Defendant Erdmann and other members of the University's Administration to notify Defendants of the highly concerning and improper practices Defendants Meeks-Rydell, Chilcoat, and Gandolfo were conducting with the Volleyball Team, and how such improper practices concerned the health and safety of Plaintiff Johnson and the Volleyball Team members under Defendants.

133.    At that time, Defendant Erdmann and the University were on notice of Defendant Meeks-Rydell's conduct.

134.    As a result of the abuse endured during this time, Plaintiff Johnson suffered severe stress and anxiety.

135.    Due to these experiences, Plaintiff Johnson was forced to withdraw from the Volleyball Team.

136.    Plaintiff Johnson still suffers from severe emotional distress as a result of the abuse and harassment she suffered from Defendants' wrongful conduct while attending the University.

### g.  **Plaintiff Hannah Maddux**

137.    Paragraphs 1 through 136 are incorporated herein as if set forth in full.

138.    Plaintiff Hannah Maddux endured significant verbal, emotional, physical, and/or sexual harassment during her time at the University under Defendant Meeks-Rydell.

139.    Defendant Meeks-Rydell pinched Plaintiff Maddux's backside, forced Plaintiff Maddux to hug her, and required Plaintiff Maddux to tell her "I love you." Plaintiff Maddux systematically witnessed other verbal, physical, emotional and sexual harassment.

140.    Plaintiff Maddux was routinely subjected to abuse, including but not limited to breakfast clubs, forced full body contact with Defendant Meeks-Rydell, and extensive and demeaning verbal harassment.

141.    Defendant Meeks-Rydell would punish Plaintiff Maddux by not putting Plaintiff Maddux in games if Defendant Meeks-Rydell did not feel that Plaintiff Maddux was earnest in saying "I love you" or would attempt to refuse hugs.

142.    Defendant Meeks-Rydell would invite Plaintiff Maddux and Maddie Soboleski to Defendant Meeks-Rydell's home, where she would attempt to persuade Plaintiff Maddux and Maddie Soboleski to buy alcohol for the senior Volleyball team members.

143.    Defendant Meeks-Rydell would also force Plaintiff Maddux to partake in "breakfast clubs" and other extreme physical punishments, inducing asthma attacks on Plaintiff Maddux while not allowing Plaintiff Maddux access to her inhaler, despite knowing that Plaintiff Maddux had asthma.

144.    Defendant Meeks-Rydell forced Plaintiff Maddux and Maddie Soboleski to participate in extreme and excessive physical activity as punishment for the team allegedly failing to secure the antennas on the volleyball nets correctly.

145.    The extreme and excessive physical activity was so intense that it caused Plaintiff Maddux to wheeze and gasp for breath while in the fetal position.

146.    While Plaintiff Maddux was gasping for breath and was unable to retrieve her inhaler, Defendant Meeks-Rydell berated her, screamed at her to arise, and repeatedly told Plaintiff Maddux how weak she was.

147.    After Plaintiff Maddux was able to breathe consistently again, she made her way into a training room where she continued to vomit so intensely that her nose bled.

148.    While Plaintiff Maddux was vomiting and experiencing a nose bleed, Defendant Meeks-Rydell was outside the training room, banging on the door and screaming at Plaintiff Maddux that she could "forget about being captain" and ordering her to return to the gym immediately.

149.    In December 2020, after Plaintiff Maddux expressed her concerns and complaints about Defendant Meeks-Rydell's behavior to Defendants Frisbey and Erdman, Plaintiff Maddux told Frisbey that she was concerned about what would happen to her if Defendant Meeks-Rydell learned of her complaints to Defendants Frisbey and Erdmann. Defendant Frisbey's response to Plaintiff Maddux was "it wouldn't be the worst thing if you got kicked off the team."

150.    As a result of the abuse endured during this time, Plaintiff Maddux suffered severe stress and anxiety.

151.    Plaintiff Maddux still suffers from severe emotional distress as a result of the abuse and harassment she suffered as a result of Defendants' wrongful conduct while attending the University.

### h.  **Plaintiff Maddie Soboleski**

152.    Paragraphs  1 through 151 are incorporated herein as if set forth in full.

153.    Plaintiff Maddie Soboleski endured significant verbal, emotional, physical, and/or sexual harassment during her time at the University under Coach Meeks-Rydell.

154.    Defendant Meeks-Rydell pinched Plaintiff Soboleski's backside, forced Plaintiff Soboleski to hug her, and required that Plaintiff Soboleski tell her "I love you." Plaintiff Maddie Soboleski systematically witnessed other verbal, physical, emotional and sexual harassment.

155.    Plaintiff Soboleski was routinely subjected to abuse, including but not limited to breakfast clubs, forced full body contact with Defendant Meeks-Rydell, and extensive and demeaning verbal harassment.

156.    On multiple occasions while the team and coaching staff were traveling for away games, Defendant Meeks-Rydell summoned Plaintiff Soboleski to her hotel room. Defendant Meeks-Rydell then forced Plaintiff Soboleski to lay in bed with her under the blankets and told Plaintiff Soboleski to "use her [Meeks-Rydell's] boobs as a pillow."

157.    While forcing Plaintiff Soboleski to hug her, Defendant Meeks-Rydell would kiss Plaintiff Soboleski on the forehead and cheek.

158.    Defendant Meeks-Rydell forced Plaintiff Soboleski to spend extensive time alone with her – often in Defendant Meeks-Rydell's residence.

159.    On several occasions Defendant Meeks-Rydell lured Plaintiff Soboleski to her home under the guise of watching film of the prior volleyball games. Once Plaintiff Soboleski arrived to Defendant Meeks-Rydell's home, Defendant Meeks-Rydell would not allow her to leave for extended periods of time. On one occasion, Plaintiff Soboleski was not allowed to leave Defendant Meeks-Rydell's home for eight hours.

160.    Defendant Meeks-Rydell forced Plaintiff Soboleski to dog sit while Defendant Meeks-Rydell was out of town. While dog sitting, Defendant Meeks-Rydell forced Plaintiff Soboleski to sleep in her bed. The interior of Defendant Meeks-Rydell's home was equipped with several security cameras. Defendant Meeks-Rydell invaded Plaintiff Soboleski's privacy by observing Plaintiff Soboleski via the security cameras.

161.    The verbal abuse that Plaintiff Soboleski suffered during the time she played under Defendant Meeks-Rydell was intentional, aggressive, persistent and meant to harm and manipulate Plaintiff Soboleski.

162.    Defendant Meeks-Rydell consistently referred to Plaintiff Soboleski by names like "bitch" and "asshole."

163.    As a result of the abuse endured during this time, Plaintiff Soboleski suffered severe mental and emotional injury, including stress and anxiety.

164.    Plaintiff Soboleski still suffers from severe emotional distress as a result of the abuse and harassment she suffered from Defendants' wrongful conduct while attending the University.

## IV.    THE UNIVERSITY FAILED TO PROTECT PLAINTIFFS AFTER BECOMING AWARE OF DEFENDANT MEEKS-RYDELL'S ABUSE

165.    Based on information and belief, Defendant Meeks-Rydell had a reputation for instilling a pattern and practice of abuse and/or sexually harassing conduct at her previous jobs, including while employed as Head Coach at the University of West Alabama.

166.    The University knew or should have known that Defendant Meeks-Rydell had a history of engaging in the physical, mental and/or emotional abuse of college athletes. Despite said constructive and/or actual knowledge, Defendants recklessly and/or with reckless indifference hired Defendant Meeks-Rydell and placed the Volleyball Team and Plaintiffs in danger's path and continue to employ Defendant Meeks-Rydell.

167.    Additionally, during the entirety of her time at the University, Defendant Meek-Rydell's inappropriate and abusive conduct frequently and consistently occurred in the physical presence of the other coaches and staff, including but not limited to, Defendants Chilcoat and Gandolfo.

31

168.    According to information and belief, some parents of the Team members, including the parents of Plaintiff Johnson, contacted University Director of Athletics Defendant Joel Erdmann directly and informed him of Defendants' inappropriate conduct as early as February of 2019, less than three months from her date of hire.

169.    Hannah Maddux's parents contacted Defendant Erdmann regarding the abuse Plaintiffs suffered under Defendant Meeks-Rydell.

170.    Defendant Erdmann, possessed actual or constructive knowledge of Defendant Meeks-Rydell's abuse and inappropriate conduct and failed to take action, and condoned, ratified and/or encouraged the wrongful and illegal conduct.

171.    Defendant Erdmann was one of the appropriate individuals who was required to take preventative and/or responsive action to protect Plaintiffs, and he failed to take action.

172.    Defendant Frisbey had knowledge of Defendant Meeks-Rydell's abuse through direct observation, from conversations with Plaintiffs and their parents, and through conversations with Defendant Meeks-Rydell.

173.    Defendant Frisbey was one of the appropriate individuals who was required to take preventative and/or responsive action to protect Plaintiffs.

174.    Defendant Frisbey actively assisted in perpetuating, condoning and/or encouraging the abuse Plaintiffs suffered as a result of the wrongful and illegal conduct of Defendant Meeks-Rydell.

175.    In early December 2020, Hannah Maddux, along with Hannah Maddux's parents, and Maddie Soboleski, and Maddie Soboleski's parents, also informed Defendant Erdmann and Defendant Frisbey of the abuse they suffered under Meeks-Rydell at the University.

176.    Assistant Coaches, including Defendants Chilcoat and Gandolfo, were physically present during and directly aware of the physically abusive pinching of the buttocks, slapping, "floor hugs," forced hugs, and breakfast clubs, as well as the emotionally manipulative and abusive verbal harassment such as forcing Volleyball Team members to say "I love you" to Defendant Meeks-Rydell.

177.    According to information and belief, on January 2021, Defendant Meeks-Rydell was placed on administrative leave.

178.    While on administrative leave, Defendants Erdmann, Frisbey, and the University allowed Defendant Meeks-Rydell to maintain access and control over the Volleyball team, including allowing Defendant Meeks-Rydell to stay in contact with the team and recruits, observe practice remotely, and discipline players through Defendant Chilcoat.

179.    Despite their actual and/or constructive knowledge of Defendant Meeks-Rydell's wrongful and illegal conduct, Defendants Erdmann, Frisbey, and the University allowed and/or facilitated Defendant Meeks-Rydell's ability to continue to coach the Volleyball team by using Defendant Chilcoat as a proxy.

180.    Defendants Chilcoat and Gandolfo were two of the appropriate individuals who were required to take preventative and/or responsive action to protect Plaintiffs.

181.    In spite of their knowledge, Defendants Chilcoat and Gandolfo failed to take any action to protect Plaintiffs after becoming aware of Defendant Meeks-Rydell's abuse.

182.    Defendants Chilcoat and Gandolfo actively perpetuated and participated in the wrongful and illegal conduct of Defendant Meeks-Rydell against Plaintiffs.

183.     Defendant had actual and/or constructive knowledge of the wrongful and illegal acts of Meeks-Rydell as described herein and Defendant Moore conspired with Meeks-Rydell and the University to conceal the wrongful and illegal acts.

184.     Defendant Moore was one of the appropriate individuals who was required to take preventative and/or responsive action to protect Plaintiffs.

185.     Defendant Moore perpetuated the wrongful and illegal acts systematically heaped upon Plaintiffs by  Meeks-Rydell.

## CAUSES OF ACTION

### COUNT I
### 20 U.S.C. § 1681, *et seq.*
### [Violation of Title IX against Defendant University]

186.     Paragraphs 1 through 185 are incorporated herein as if set forth in full.

187.     Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a), provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." The University of South Alabama cannot dispute that it was at the relevant times hereto, and continues to be, a recipient to Federal financial assistance, subject to Title IX.  Sexual harassment of students is one form of discrimination on the basis of sex prohibited by Title IX.  *See Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999).

188.     To prevail in a teacher-on-student harassment claim, the plaintiff must be able to 1) identify a person with "authority to take corrective measures in response to actual notice of sexual harassment," 2) demonstrate that the notice was "sufficient to alert the school official of the possibility of the Title IX plaintiff's harassment," and 3) show that the authority figure acted with deliberate indifference to the notice of harassment.  *J.F.K. v. Troup Cty. Sch. Dist.*, 678 F.3d 1254,

1255-56 (11th Cir. 2012) citing *Doe v. School Bd. Of Broward County, Fla,* 604 F.3d 1248, 1254 (11th Cir. 2010); *Hurt v. Shelby Cnty. Bd. of Educ.*, 198 F. Supp. 3d 1293, 1317 (N.D. Ala. 2016). Plaintiffs can satisfy all of these inquiries.

189.    Defendant University is an educational institution, a recipient of federal funds, and is subject to private causes of action under Title IX.

190.    Defendant University had knowledge of extensive, offensive, and perversive gender-specific abuse and harassing conduct, which was directed at Plaintiffs and which was based on their sex, in violation of Title IX, 20 U.S.C. § 1681, *et seq.*  The omissions and/or commissions by Defendant University were both subjectively and objectively unreasonable and resulted in harm to, and the interference with and denial of educational and athletic opportunity for, each of the Plaintiffs.

191.    Defendant Meeks-Rydell, who was the head volleyball coach, in a position of authority over Plaintiffs, and who had daily contact with Plaintiffs, intentionally and repeatedly harassed, physical assaulted, and violated Plaintiffs during her tenure at the University, including by subjecting them to gender-specific harassment and by subjecting them to general, pervasive, and persistent harassment, including unwanted sexual advances and unwanted touching.

192.    The abuse and harassment Plaintiffs experienced was unwelcome and was sufficiently severe, pervasive, and objectively offensive so as to routinely and systematically deprive Plaintiffs of equal access to educational activities and programs. Indeed, as illustrated by some of the correspondence between Meeks-Rydell and Plaintiffs, Defendants' conduct was objectively outrageous, systematic and severe.

193.    The harassment was so severe, pervasive, and objectively offensive that it barred Plaintiffs' access to the education and activities to which they were entitled while attending the University.

194.    Defendant University – through University officials and specifically through Defendants Erdmann, Frisbey, Moore, Chilcoat, and Gandolfo – had actual knowledge of the harassment and misconduct by Defendant Meeks-Rydell toward Plaintiffs.

195.    Defendant University – as well as Defendants Erdmann, Frisbey, Moore, Chilcoat, and Gandolfo, who were appropriate persons for the purposes of notice under Title IX – was on actual notice of the wrongful and illegal conduct of Defendant.

196.    Defendants Erdmann, Frisbey, Moore, Chilcoat, Gandolfo, and the University had the authority to initiate corrective action to stop Defendant Meeks-Rydell's unlawful conduct to prevent the continued and repetitive harassment of Plaintiffs based on their gender.

197.    Defendant University had the authority to institute corrective measures to remedy the willful violations of Title IX.  However, they failed to undertake such actions and instead acted with deliberate indifference to these violations.  The University failed to take disciplinary or remedial action against Defendant Meeks-Rydell.

198.    As a result of the above actions by Defendants, Plaintiffs suffered physical, emotional, mental, and financial damages, and continue to so suffer.

**WHEREFORE**, the premises considered, the Plaintiffs demand judgment against the Defendants in an amount greater than the minimum jurisdictional limits of this Court for damages, costs, and such other and proper relief as this Court deems appropriate.

## COUNT II
### 42 U.S.C. § 1983
**[Violation of Substantive Due Process
against Defendants University, Erdmann, Frisbey, Moore,  Chilcoat, and Gandolfo]**

199.    Paragraphs 1 through 198 are incorporated herein as if set forth in full.

200.    Plaintiffs have a liberty interest in their bodily integrity, which is protected by the Due Process Clause of the Fourteenth Amendment.[7]

201.    Defendant University denied Plaintiffs' Substantive Due Process Rights by hiring Meeks-Rydell while having constructive and/or actual knowledge of her wrongful and illegal conduct at prior institutions; and by failing to protect Plaintiffs m from harassment and sexual assault and through participation in an incompetent scheme whereby Plaintiffs were left alone and unprotected in compromising situations with Defendant Meeks-Rydell, whereby Defendant Meeks-Rydell could take advantage of her position of power and authority over Plaintiffs and harass and assault them with impunity.

202.    Defendant Meeks-Rydell's conduct directly and unreasonably interfered with Plaintiffs' education and participation in the women's volleyball program at the University and created an intimidating, hostile and offensive environment that affected Plaintiffs' psychological and physical well-being, and deprived them of the rights guaranteed to Plaintiffs under the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

203.    Defendant University demonstrated deliberate indifference toward the Plaintiffs' constitutional rights by failing to protect Plaintiffs from the known and continuous abusive conduct to which Plaintiffs were subjected to by Defendant Meeks-Rydell while on the University campus, University transportation, University facilitated housing/hotel arrangements and at University sponsored events.

---

[7] *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S. Ct. 2258, 2267, 138 L. Ed. 2d 772 (1997) (citing *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

204.    Due to Defendant University's deliberate indifference, Defendant University proximately caused the violation of Plaintiffs' rights.

205.    As a direct result of the failure of the University to intervene, report or prohibit the inappropriate and harassing conduct of Defendant Meeks-Rydell, Plaintiffs have been deprived of the rights guaranteed to them under the Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. § 1983.

206.    Defendants Erdmann, Frisbey, Moore, Chilcoat, Gandolfo, and the University had actual knowledge of Defendant Meeks-Rydell's continuous abusive conduct towards Plaintiffs, and were appropriate individuals who were required to take preventative and/or responsive action to protect Plaintiffs., By refusing to address the wrongful and illegal conduct, and by failing to take any preventative and/or responsive action to protect Plaintiffs, the Defendants demonstrated deliberate indifference toward the Plaintiffs' constitutional rights and thereby proximately caused the violation of those rights.

207.    As a direct result of the failure of Defendants Erdmann, Frisbey, Moore, Chilcoat, Gandolfo, and the University to act, intervene, report or prohibit the wrongful and illegal conduct of Defendant Meeks-Rydell, Plaintiffs have been deprived of the rights guaranteed to them under the Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. § 1983.

208.    As a result of the above actions by Defendants, Plaintiffs suffered physical, emotional, mental, and financial damages, and continue to so suffer.

**WHEREFORE**, the premises considered, the Plaintiffs demand judgment against the Defendants in an amount greater than the minimum jurisdictional limits of this Court for compensatory damages, punitive damages, costs, and such other and proper relief as this Court deems appropriate.

## COUNT III
### Negligent/Wanton/Reckless Hiring, Retention, and Supervision
### in Violation of Alabama Law
### [Against Defendant University]

209.   Paragraphs 1 through 208 are incorporated herein as if set forth in full.

210.   At all times relevant to this action, Defendants University and Meeks-Rydell engaged in an employer-employee relationship.

211.   As alleged above, Defendant Meeks-Rydell had a history of similar, outrageous and harassing wrongful and illegal conduct at while previously employed by another institution.

212.   Defendant University failed to conduct a reasonably prudent investigation of Meeks-Rydell's employment and/or personal background prior to hiring her in December of 2018. The University had a duty to exercise reasonable care for the safety and wellbeing of its students, and in fulfilling this duty, it was obligated to conduct a thorough investigation before installing Meeks-Rydell in a position of tremendous authority- especially in light of the power that Meeks-Rydell would wield over Plaintiffs' and other young women's daily lives and academic and athletic opportunities.[8]  But for the failure to properly investigate Meeks-Rydell, Plaintiffs would not have suffered injury and damage as a result of Meeks-Rydell's wrongful and illegal conduct..

213.   The University was negligent, reckless, wanton, and/or recklessly indifferent in its hiring of Defendant Meeks-Rydell.  As set forth above, the University knew or should have known of Defendant Meeks-Rydell's propensity for tortious conduct, including without limitation harassment, sexual harassment, and physical assault of students.

---

[8] *See, e.g., Massey v. Smithway Motor Xpress, Inc., et al.*, (Memorandum of Opinion, pg. 14, 7:08-cv-02025-LSC, N.D.A.L., Jan. 27, 2010), "In the context of a negligent or wanton hiring, retention, and supervision claim, 'an employer has a duty to exercise reasonable care for the safety of his customers, patrons, or other invitees, and in fulfilling this duty he must use due care to avoid the selection or retention of an employee whom he knows or should know is a person unworthy, by habits, temperament, or nature, to deal with [those persons].'" (quoting *Brown v. Vanity Fair Mills, Inc.*, 291 Ala. 80, 82 (Ala. 1973)).

214.    The University was also negligent, reckless, wanton, and/or recklessly indifferent in failing to adequately supervise Defendant Meeks-Rydell during her tenure as Head Coach.

215.    The University was negligent, reckless, wanton, and/or recklessly indifferent in retaining Defendant Meeks-Rydell after being put on notice of the severe, offensive, pervasive, and discriminatory abuse and harassment of Plaintiffs.

216.    Defendant Meeks-Rydell's repetitive and severe wrongful and illegal conduct rendered her unfit to hold the position of Coach and created a danger of imminent harm to the members of the University's Volleyball Team.

217.    Notwithstanding the University's actual knowledge of Defendant Meeks-Rydell's outrageous conduct and unfitness for the position of Head Coach, the University retained Defendant Meeks-Rydell and failed to take immediate and appropriate action to protect the female members of the Volleyball Team – ostensibly focused upon securing a winning season.

218.    Defendant Meeks-Rydell w was unequivocally acting in the line and scope of her employment when engaged in her wrongful and illegal conduct, as set forth herein, and her actions were so closely connected with her duties and so fairly incidental to her employment that they should be regarded as carrying out the objectives of her position on the University staff.

219.    As a direct and proximate cause of the University's negligent, reckless, wanton, and/or recklessly indifferent hiring, supervision, and retention, Plaintiffs suffered damages, including but not limited to emotional trauma, mental anguish and suffering, impairment of reputation, personal humiliation, embarrassment, anxiety, economic loss and alienation both academically and socially from school activities.

220.     Defendants' conduct has been continuous in nature, thereby constituting a continuing tort through that date, and as alleged herein, includes, according to information and belief, continued efforts to conceal the extent and degree of the Defendants' wrongful conduct.

221.     As a result of the above actions by Defendants, Plaintiffs suffered physical, emotional, mental, and financial damages, and continue to so suffer.

**WHEREFORE**, the premises considered, the Plaintiffs demand judgment against the Defendants in an amount greater than the minimum jurisdictional limits of this Court for compensatory damages, punitive damages, costs, and such other and proper relief as this Court deems appropriate.

### COUNT IV
### Assault and Battery in Violation of Alabama Law
### [Against all Defendants]

222.     Paragraphs 1 through 221 are incorporated herein as if set forth in full.

223.     A teacher or school administrator is liable for assault and battery where the conduct is in contravention of the school's policies and where the agent acted with malice.

224.     As described above, Plaintiffs were assaulted and battered by Defendant Meeks-Rydell in all ways aforementioned, including, but not limited to, all of the above-described physical touching.

225.     Defendant Meeks-Rydell's intentional assault and battery was in contravention of the University's regulations, rules and/or policies, and was without just cause or excuse.

226.     Defendants University, Erdmann, Frisbey, Moore, Chilcoat, and Gandolfo countenanced and ratified the assault and battery of Plaintiffs by Defendant Meeks-Rydell when they failed and refused to take any reasonable steps to protect Plaintiffs from the continued and

persistent assault and battery. Accordingly, Defendants University, Erdmann, Chilcoat, and Gandolfo are responsible for the assault and battery upon Plaintiffs.

227.    As a proximate consequence thereof, Plaintiffs were caused to suffer damages as enumerated herein.

228.    The actions and/or omissions of Defendants in harming Plaintiffs as set out above were willful and wanton.   Namely, Defendant Meeks-Rydell unlawfully touched Plaintiffs consistently for an extended amount of time, while wielding the power of her office. Such conduct was willful and wanton. Similarly, Defendants Chilcoat and Gandolfo willfully and wantonly observed the wrongful touching, and assault and battery of Plaintiffs and willfully and wantonly failed to take action, and failed to report or rectify the wrongful conduct.

229.    As a result of the above actions by Defendants, Plaintiffs suffered physical, emotional, mental, and financial damages, and continue to so suffer.

**WHEREFORE**, the premises considered, the Plaintiffs demand judgment against the Defendants in an amount greater than the minimum jurisdictional limits of this Court for compensatory damages, punitive damages, costs, and such other and proper relief as this Court deems appropriate.

## COUNT V
### Invasion of Privacy in Violation of Alabama Law
### [Against all Defendants]

230.    Paragraphs 1 through 229 are incorporated herein as if set forth in full.

231.    For an invasion of privacy claim in Alabama, there must be a prying or intrusion and the intrusion must be offensive or objectionable to a reasonable person. The thing into which there is intrusion or prying must be and be entitled to be, private. *Busby v. Truwall Systems Corp.*, 551 So. 2d 322, 323-24 (Ala. 1989).

232.     The actions of Defendant Meeks-Rydell described above constituted an invasion of privacy upon Plaintiffs' physical solitude and/or seclusion and did so in violation of ordinary decency, imposing emotional distress upon Plaintiffs.

233.     Specifically, Defendant Meeks-Rydell manipulated Plaintiffs into providing personal and medical information to Defendant Meeks-Rydell under the guise of doing so confidentially, which she then publicly shared with the entire Volleyball team to shame the individuals who shared personal and private information with Defendant Meeks-Rydell.

234.     Defendant Meeks-Rydell also invaded Plaintiffs' privacy by forcing unwanted physical contact with repeatedly and consistently.

235.     Defendants University, Erdmann, Frisbey, and Moore countenanced and ratified Defendant Meeks-Rydell's conduct when they failed and refused to take any reasonable steps to protect Plaintiffs from the invasion of privacy. Accordingly, Defendants University, Erdmann, Frisbey, and Moore are responsible for the invasion of privacy upon Plaintiffs. Similarly, Defendants Chilcoat and Gandolfo observed the invasions of privacy of Plaintiffs and willfully and wantonly failed to take action, and failed to report or rectify the wrongful conduct.

236.     As a result of the above actions by Defendants, Plaintiffs suffered physical, emotional, mental, and financial damages, and continue to so suffer.

**WHEREFORE**, the premises considered, the Plaintiffs demand judgment against the Defendants in an amount greater than the minimum jurisdictional limits of this Court for compensatory damages, punitive damages, costs, and such other and proper relief as this Court deems appropriate.

### COUNT VI
**Intentional Infliction of Emotional Distress (Outrage)**
**in Violation of Alabama Law**
**[Against all Defendants]**

237.   Paragraphs 1 through 236 are incorporated herein as if set forth in full.

238.   To succeed on an action based on outrage, a plaintiff must prove (1) the Defendants intended to inflict emotional distress, or know or should have known that emotional distress would likely result from their conduct; (2) the Defendants' conduct was extreme and outrageous; (3) the Defendants' actions caused her distress; and (4) the distress was severe.

239.   Defendants knew or should have known that Defendant Meeks-Rydell's physical, emotional, and psychological abuse of Plaintiffs, would likely result in emotional distress.

240.   Defendants Erdmann, Frisbey, Moore, Chilcoat, and Gandolfo's deliberate indifference to Defendant Meeks-Rydell's continuous extreme and outrageous conduct, including but not limited to sexual assault, physical assault, emotional and psychological abuse, itself constitutes extreme and outrageous conduct.

241.   Defendants' extremely and outrageously reckless, intentional, and egregious conduct was known or should have been known to result in emotional distress.

242.   As a result of Defendants' conduct, Plaintiffs suffered severe emotional distress.

243.   Given the Defendants' wrongful and illegal conduct, and the ramifications of Defendants' conduct on Plaintiffs' lives, the damage and emotional distress on Plaintiffs is so severe that no reasonable person could be expected to endure it.

244.   As a result of the above actions by Defendants, Plaintiffs suffered physical, emotional, mental, and financial damages, and continue to so suffer.

**WHEREFORE**, the premises considered, the Plaintiffs demand judgment against the Defendants in an amount greater than the minimum jurisdictional limits of this Court for compensatory damages, punitive damages, costs, and such other and proper relief as this Court deems appropriate.

## COUNT VII
### Breach of Contract
### [Against Defendant University]

245.    Paragraphs 1 through 244 are incorporated herein as if set forth in full.

246.    Plaintiffs and the University are parties to a contract wherein Plaintiffs committed to play for the University Volleyball Team in exchange for a tuition-free higher education, an adequate and safe living environment, and an adequate and safe educational environment.

247.    Instead, Plaintiffs were subjected to frequent and severe physical, emotional and mental abuse, depriving them of the tuition-free higher education, adequate and safe living and/or educational environment the University was obligated to provide for Plaintiffs.

248.    The University breached their contracts with Plaintiffs, among other ways, by failing to adequately prevent Plaintiffs from the dangerous and harassing conditions on campus that Defendant University allowed to metastasize in light of their knowledge of Defendant Meeks-Rydell's continuous abuse and harassment of Plaintiffs.

249.    Defendant University breached these contracts with Plaintiffs by failing to provide an adequately safe living and educational environment for Plaintiffs.

250.    As a result of these breaches, Defendant Meeks-Rydell's harassment of Plaintiffs was allowed to continue and go unpunished.

251.    As a result of these breaches, Plaintiffs suffered the loss of the support of Defendant University in important matters affecting their education, and Plaintiffs were humiliated in the face of their harasser.

252.    Specifically, Plaintiffs Silver and Tipping were forced to transfer and forego their scholarship – causing her to wrongfully incur significant financial harm.

253.    Plaintiff DeMarcus similarly was forced to transfer and forego her scholarship due to the University's breaches, and has incurred significant financial harm.

**WHEREFORE**, the premises considered, the Plaintiffs demand judgment against the Defendants in an amount greater than the minimum jurisdictional limits of this Court for compensatory damages, punitive damages, costs, and such other and proper relief as this Court deems appropriate.

<u>**COUNT VIII**</u>
**Civil Conspiracy**
**[Against Defendants University, Moore, Meeks-Rydell, and Chilcoat]**

254.    Paragraphs 1 through 253 are incorporated herein as if set forth in full.

255.    Under Alabama law "[l]iability for civil conspiracy rests upon the existence of an underlying wrong, and if the action alleged to constitute the underlying wrong provides no cause of action, then neither does the conspiracy itself." *Barber v. Bus. Prods. Ctr, Inc*., 677 So. 2d 223, 228 (Ala. 1996); *see also Tillman v. R.J. Reynolds Tobacco Co*., 871 So. 2d 28, 35 (Ala. 2003) (finding that conspiracy alone is not itself a cause of action, and that "[t]here must be an underlying wrong to support the conspiracy claim").

256.    The elements of a civil conspiracy claim are "an agreement, between two or more persons, to accomplish either an unlawful end, or a lawful end by unlawful means, resulting in damage to the plaintiff." *Peters v. Amoco Oil Co*., 57 F. Supp. 2d 1268, 1284 (M.D. Ala. 1999).; *Haapanen v. Bogle*, 643 So. 2d 547, 551 (Ala. 1994); *Snyder v. Faget*, 326 So. 2d 113, 116 (Ala. 1976).

257.    Defendants University, Moore, Defendants Meeks-Rydell, and Chilcoat came to an agreement whereby they would falsely claim that Plaintiff Tipping would owe a large sum of money as a fine if she did not comply with certain demands.

258.    This agreement was made to accomplish unlawful ends, including perpetuating wrongful and illegal conduct to which Plaintiffs were subject.

259.    As a result of Defendants' agreement, Plaintiffs continue to suffer abuse under Defendants and Plaintiff Tipping lost opportunities to play volleyball for a scholarship in America.

**WHEREFORE**, the premises considered, the Plaintiffs demand judgment against the Defendants in an amount greater than the minimum jurisdictional limits of this Court for compensatory damages, punitive damages, costs, and such other and proper relief as this Court deems appropriate.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter an Order which will:

A.    Declare the conduct engaged in by the Defendants to be in violation of Plaintiffs' rights under federal and Alabama law;

B.    Award Plaintiffs compensatory damages against the Defendants in an amount that will fully compensate Plaintiffs for all they suffered and continue to suffer in the future as a direct and/or proximate result of the statutory and common law violations as set forth herein;

C.    Enter a judgment against Defendants for such punitive damages as will properly punish them for the constitutional, statutory, and common law violations perpetrated against Plaintiffs as alleged herein, in an amount that will serve as a deterrent to Defendants and others similarly situation from engaging in similar conduct in the future;

D.    Award Plaintiffs pre-judgment and post-judgment interest at the highest rates allowed by law;

E.    Award Plaintiffs costs and attorneys' fees;

F.    Award statutory damages pursuant to 42 U.S.C. § 1983;

G.    Assume continuing and indefinite jurisdiction to ensure compliance with the terms of the Orders requested herein; and

H.    Award Plaintiffs such other and further relief, including equitable relief, that this Court deems just and proper.


DATED:  February 22, 2022

                                              */s/Eli J. Hare*_____
Diandra S. Debrosse Zimmermann
(ASB-2956-N76D)
Eli J. Hare
(ASB-1024-T20Q)
**DICELLO LEVITT GUTZLER LLC**
420 20th Street North, Suite 2525
Birmingham, Alabama 35203
(205) 855-5700
fu@dicellolevitt.com
ehare@dicellolevitt.com

Kenneth P. Abbarno
(*Pro Hac Vice*)
**DICELLO LEVITT GUTZLER LLC**
Western Reserve Law Building
7556 Mentor Avenue
Mentor, Ohio 44060
(440) 953-8888
kabbarno@dicellolevitt.com

*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 22, 2022, I electronically filed the foregoing with the court's electronic system, which provides service on all counsel of record.

Celia J. Collins
Elizabeth Rehm
JOHNSTONE ADAM LLC
1 St. Louis Centre
1 St. Louis Street, Ste. 4000
Mobile, AL  36602
(251) 432-7682
cjc@johnstoneadams.com
edr@johnstoneadams.com

Mary E. Pilcher, Esquire
STEIN & PILCHER, LLC
Post Office Box 602
Fairhope, AL  36533-0602
mpilcher@mobilebaylaw.com

Windy C. Bitzer, Esquire
Christine Harding Hart, Esquire
HAND ARENDALL HARRISON,
SALE, LLC
Post Office Box 123
Mobile, AL  36601
wbitzer@handfirm.com
chart@handfirm.com

/s/ *Eli J. Hare*_____
Of Counsel

49