[PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 23-11670

_____

RACHAEL DEMARCUS,
ALEXIS SILVER,
HANNAH MADDUX,
MADDIE SOBOLESKI,
CAITLIN TIPPING, et al.,

Plaintiffs-Appellants,

*versus*

UNIVERSITY OF SOUTH ALABAMA,
ALEXIS MEEKS-RYDELL,
ROBERT CHILCOAT,
PATRICIA GANDOLFO,
JOEL ERDMANN, et al.,

Defendants-Appellees.

2                          Opinion of the Court                        23-11670

———————————————————

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:21-cv-00380-KD-B

———————————————————

Before JORDAN, NEWSOM, and BRASHER, Circuit Judges.

NEWSOM, Circuit Judge:

Several college volleyball players accused their coach of mistreating them—physically, verbally, psychologically, and sexually. The players' accusations are serious, and the coach's conduct, if it occurred as alleged, may well have violated state law in some way. The question for us, though, is a narrow one: Do the players' allegations assert violations of *federal* law—specifically, of either Title IX or 42 U.S.C. § 1983? We hold that they do not. We therefore affirm the district court's order dismissing the players' claims.

**I**

**A**

For two seasons, Alexis Meeks-Rydell was the head coach of the University of South Alabama women's volleyball team.[1]

———————————————————

[1] This case reaches us on an appeal from the district court's grant of Meeks-Rydell's and the University's motions to dismiss. So, for purposes of this appeal, we take the facts alleged in the complaint as true and "constru[e] them in the light most favorable to the plaintiff." *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1291 (11th Cir. 2007).

According to eight players, during that time Meeks-Rydell "engag[ed] in a pattern and practice of sexual harassment and physical, verbal, and psychological abuse." Third Am. Compl. ¶¶ 37, 40, Doc. 64. The players—whose names we'll need to reference below—are Rachael DeMarcus, Alexis Silver, Caitlin Tipping, Meaghan Jones, Hannah Kazee, Hannah Johnson, Hannah Maddux, and Maddie Soboleski.

The players allege that either they or their parents (or both) reported Meeks-Rydell's misconduct to various University administrators, including Athletic Director Joel Erdmann, Senior Associate Athletic Director Jinni Frisbey, and Associate Athletic Director Chris Moore. They also assert that assistant women's volleyball coaches Rob Chilcoat and Patricia Gandolfo witnessed Meeks-Rydell's abuse on an ongoing basis.

The players accuse Meeks-Rydell of engaging in all manner of sexual abuse. They generally allege that Meeks-Rydell pinched their buttocks, required them to participate in "floor hugs" (which involved Meeks-Rydell lying on top of a player), and forced them to tell her that they loved her. Individual players level additional allegations. DeMarcus asserts that Meeks-Rydell sent her sexually inappropriate text messages. Kazee says that Meeks-Rydell reduced her playing time and psychologically punished her when she complained that inappropriate touching made her uncomfortable. And Soboleski makes a series of claims—namely, that Meeks-Rydell (1) periodically kissed her on the forehead and cheek, (2) forced her to spend extensive time alone with her, including at Meeks-

Rydell's house, and (3) summoned her to her hotel room several times for "sexual conduct," including, on one occasion, when Meeks-Rydell forced Soboleski to lie in bed with her and told her to "use her [] boobs as a pillow." Third Am. Compl. ¶¶ 159–63. The complaint specifically asserts that Soboleski reported the hotel-related allegation to Erdmann and Frisbey in December 2020.

As for non-sexual abuse, the players generally allege that Meeks-Rydell swore at and made abusive comments to them, blamed them for her personal problems, accused them of faking injuries, forced them to play through serious medical conditions, concealed their injuries from school trainers, and instituted corporal punishments (including extreme early-morning "breakfast club[]" workouts). Individual players also make more specific allegations, some of which they say were witnessed by or reported to other University employees. DeMarcus claims that Meeks-Rydell slapped her in retaliation for telling an athletic trainer about an injury—an act she says Chilcoat and Gandolfo witnessed. DeMarcus also asserts that Meeks-Rydell forced her to play through a head injury, leading to a concussion and supraventricular tachycardia—conduct she says an athletic trainer reported to Frisbey. Tipping alleges that Moore and Meeks-Rydell intimidated her (using a fabricated $6,000 fine) into writing a letter to the NCAA stating that she was leaving the University due to concerns about fires in Australia rather than the physical, emotional, and sexual abuse that she had experienced. Kazee asserts that the coaching staff denied her medical attention after an on-court injury and that she had to crawl out of the gym, leading to a two-week hospital stay—an incident

23-11670                Opinion of the Court                5

she says her parents reported to Frisbey.  Johnson alleges that Meeks-Rydell and Chilcoat instituted a practice drill in which they would spike balls towards players' faces, which caused her to suffer a concussion—an act she says her mother reported to Frisbey.  And Maddux asserts that Meeks-Rydell once forbade her from using her inhaler when she was gasping for air and once screamed at her when she was vomiting and experiencing a nosebleed—conduct she says she and Soboleski reported to Frisbey and Erdmann.

The complaint also contains allegations of non-sexual abuse unaccompanied by any assertion that they were witnessed by or reported to other University employees.  Jones, for instance, alleges that Meeks-Rydell forced her to run extra sprints as punishment for attempting to retrieve her inhaler during an asthma attack.  Kazee alleges that Meeks-Rydell publicly informed the entire team of confidential conversations the two had concerning her mental and physical health.  And Silver alleges that because of the physical abuse suffered at the hands of Meeks-Rydell, she lost 40 pounds in a single semester.

Following an influx of these complaints in December 2020, Meeks-Rydell was placed on administrative leave in January 2021.  A month later, she resigned.

**B**

Following Meeks-Rydell's resignation, the players sued (1) the University (a) under Title IX and (b) for breach of contract, and (2) Meeks-Rydell, Erdmann, Frisbey, Moore, Chilcoat, and Gandolfo (a) under § 1983 and (b) under various state laws.

Eventually, the district court dismissed the players' operative complaint. The court found that the players had abandoned their breach-of-contract claims and therefore dismissed them with prejudice. The court also dismissed the Title IX and § 1983 claims with prejudice for failure to state a claim. Finally, because it had dismissed the federal claims, the court declined to exercise supplemental jurisdiction over the remaining state-law claims and dismissed those without prejudice.

This is the players' appeal of the dismissal of their Title IX and § 1983 claims.[2]

## II

We must decide whether the players' Title IX claims and § 1983 claims were properly dismissed under Federal Rule of Civil Procedure 12(b)(6). Dismissal for failure to state a claim is proper when the plaintiff can't allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if the facts asserted "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Importantly, while "factual allegations" are entitled to an assumption of truth, "[t]hreadbare recitals of the elements of a

---

[2] "We review *de novo* the district court's order granting the defendants' motion to dismiss, taking the facts alleged in the complaint as true and construing them in the light most favorable to the plaintiff." *Williams*, 477 F.3d at 1291 (citation omitted).

cause of action, supported by mere conclusory statements," are not. *Id.* at 678–79.

<h2 style="text-align:center">A</h2>

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be . . . subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  The Supreme Court has held that the statute includes a private right of action and has interpreted sex "discrimination" to include sexual harassment.  *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 709, 717 (1979); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998).   And we have established a test for "teacher on student" sexual-harassment claims under Title IX: (1) "[T]he plaintiff must be able to identify an 'appropriate person' under Title IX . . . with the authority to take corrective measures in response to actual notice of sexual harassment"; (2) "the substance of that actual notice must be sufficient to alert the school official of the possibility of the Title IX plaintiff's harassment"; and (3) "the official with such notice must exhibit deliberate indifference to the harassment."  *Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1254 (11th Cir. 2010) (citations omitted).

Applying *Broward*'s test, the district court held that the players failed to state a Title IX claim.  First, the court concluded that only Erdmann, Frisbey, and Moore were "appropriate persons," because Chilcoat and Gandolfo were merely assistant coaches under Meeks-Rydell.  Then, it ruled that only one report by the players constituted notice to an appropriate person of sexual harassment—

Soboleski's December 2020 report of the hotel-related incidents. And finally, it held that the University did not act with deliberate indifference upon receiving that notice because Meeks-Rydell was placed on administrative leave in January 2021, resigned in February 2021, and did not interact with the players after the December 2020 report. The district court was correct in all three respects.

### 1

An "appropriate person" for Title IX notice purposes is "an official of the recipient entity with authority to take corrective action to end the discrimination." *Gebser*, 524 U.S. at 290. Although the line isn't "clearly delineated," the official to whom notice is given must be at least "'high enough up the chain-of-command that his acts constitute an official decision by the school district itself not to remedy the misconduct.'"[3] *Broward*, 604 F.3d at 1254–55

---

[3] There is a wrinkle. We first addressed the "appropriate person" issue in *Floyd v. Waiters*, 133 F.3d 786, 789–93 (11th Cir. 1998) (*Floyd I*), *vacated by* 525 U.S. 802 (1998), *reinstated in* 171 F.3d 1264 (11th Cir. 1999). Our opinion in *Floyd I* seemed to set a high (and rigid) bar, limiting the class of appropriate persons to (1) members of the institution's governing board (there, the local school board) and (2) those designated by state law with "'administrative control or direction' of the school district under Title IX," such as, at least under the applicable Georgia law, the superintendent. *Id.* at 791–92. Not long thereafter, though, the Supreme Court decided *Gebser* and vacated *Floyd I* with instructions to reconsider in the light of its decision. On remand, the panel did two things. First, it "reinstate[d its] prior decision *and opinion.*" *Floyd v. Waiters*, 171 F.3d 1264, 1264 (11th Cir. 1999) (*Floyd II*) (emphasis added). But second, in doing so, it characterized its earlier holding in *Floyd I* in a way that was arguably consistent with *Gebser* but also arguably inconsistent with *Floyd I*. In particular, without mentioning *Floyd I*'s seeming adoption of a bright-line

(quoting *Floyd v. Waiters*, 171 F.3d 1264, 1264 (11th Cir. 1999) (*Floyd II*)).

Ultimately, the "question of who is an appropriate person is 'necessarily a fact-based inquiry' because 'officials' roles vary among school districts.'" *Id.* at 1256 (citation omitted). In conducting the appropriate-person analysis, we distinguish between Title IX cases involving student-on-student harassment and those involving staff-on-student harassment. A "broad[] number of administrators and employees" can be "appropriate persons" with regard to student-on-student harassment. *Hawkins v. Sarasota Cnty. Sch. Bd.*, 322 F.3d 1279, 1287 (11th Cir. 2003). But "[w]ith respect to harassment by teachers or staff, application of the Supreme Court's [test] . . . results in a limited and readily identifiable number of school administrators." *Id.*

---

board-member-or-superintendent rule, the *Floyd II* panel described *Floyd I* as requiring, more flexibly, that an appropriate person be (1) a "supervisor with authority to take corrective action" and (2) "a school official high enough up the chain-of-command that his acts constitute an official decision by the school district itself." 171 F.3d at 1264. More than a decade later, in *Broward*, we appeared to recognize the tension by noting that neither the Supreme Court "[n]or . . . our circuit" had "clearly delineated which school officials are appropriate persons." 604 F.3d at 1254–55. And we appeared to resolve that tension by adopting the following "elaboration of the Supreme Court's 'appropriate person' requirement"—"that the official with notice of the harassment must be 'high enough up the chain-of-command that his acts constitute an official decision by the school district itself not to remedy the misconduct.'" *Id.* at 1255 (quoting *Floyd II*, 171 F.3d at 1264). We accept *Broward*'s resolution of the tension and its articulation of our post-*Gebser* "appropriate person" standard.

Taking as true the facts alleged in the complaint, only Erdmann, Frisbey, and Moore are appropriate persons for Title IX purposes. Erdmann was the Athletic Director, Frisbey was the Senior Associate Athletic Director, and Moore was the Associate Athletic Director. All were "school administrators" with authority over Meeks-Rydell, and the University doesn't even dispute that they qualify as appropriate persons.

But Chilcoat and Gandolfo, Meeks-Rydell's assistant coaches, were not appropriate persons. Aside from multiple bald assertions, the players don't provide any explanation why Chilcoat and Gandolfo qualify. To be clear, their designation as assistant coaches—notably, beneath Meeks-Rydell on the organizational chart—doesn't make them appropriate persons. As assistant coaches, Chilcoat and Gandolfo were at the bottom of the "chain of command" described in *Broward*. *See* 604 F.3d at 1254–55. Our decision in *Hawkins* makes this even clearer: As already noted, we said there that in a Title IX case involving harassment by teachers or staff, the category of appropriate persons is "limited" to a "readily identifiable number of school administrators." *Hawkins*, 322 F.3d at 1287. In no way were Chilcoat and Gandolfo "school administrators," and the players make no attempt to argue otherwise. *See also Burks v. Board of Trs. of Fla. A & M Univ.*, 505 F. Supp. 3d 1273, 1280 (N.D. Fla. 2020) (holding similarly that plaintiffs had not proven that an assistant coach was an "appropriate person").[4]

---

[4] Courts have disagreed over whether an employee *must* be the alleged perpetrator's supervisor in order to qualify as an appropriate person. *Compare Rosa*

Comparisons to those we have held to be—and not to be—appropriate persons further confirm that Chilcoat and Gandolfo don't qualify.  In *Broward*, for instance, we held that a high school principal was an appropriate person to receive a report of sexual assault by a teacher.  604 F.3d at 1255–56.  In *Floyd I*, however, we held that not even a school security guard's direct supervisor was an appropriate person to whom to report the guard's alleged sexual assault.  *Floyd v Waiters*, 133 F.3d 786, 788, 793 (11th Cir. 1998) (*Floyd I*), *vacated by* 525 U.S. 802 (1998), *reinstated in* 171 F.3d 1264 (11th Cir. 1999).[5]

---

*H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 660 (5th Cir. 1997) (holding that an appropriate person is "a school official who . . . was invested by the school board with the duty to supervise the employee and the power to take action that would end such abuse"), *with Wadsworth v. Nguyen*, 129 F.4th 38, 70 (1st Cir. 2025) (holding that a high-school assistant principal who had been designated by the superintendent as a proper person to whom to make Title IX complaints was an appropriate person to receive a report of abuse by that high school's principal).  We needn't decide that issue today, because nothing here turns on Chilcoat and Gandolfo's status as supervisors or assistants.

[5] The players cite three non-binding district court decisions that, they say, hold that those in "assistant" positions can qualify as "appropriate persons."  *See* Br. of Appellants at 30–31.  None helps them.  Two involved student-on-student sexual harassment.  *See S.M. v. Sealy Indep. Sch. Dist.*, No. H-20-705, 2021 WL 1599388, at *1 (S.D. Tex. Apr. 23, 2021); *J.B. v. Klein Indep. Sch. Dist.*, No. 4:19-CV-0210, 2020 WL 813020, at *6–7 (S.D. Tex. Feb. 18, 2020), *report and recommendation adopted*, 2020 WL 1156121 (S.D. Tex. Mar. 9, 2020).  And the third had nothing to say about the assistant issue.  *See C.K. v. Wrye*, No. 4:15-00280, 2015 WL 5099308, at *6 (M.D. Pa. Aug. 31, 2015) (addressing a teacher's aide who had been accused of harassment, not one who had received a report of another's harassment).

\* \* \*

For the foregoing reasons, we hold that Erdmann, Frisbey, and Moore were "appropriate persons" to receive notice of misconduct for Title IX purposes, but that Chilcoat and Gandolfo were not. In the next section, we will determine whether Erdmann, Frisbey, or Moore received the required "actual notice."

**2**

As relevant here, "actual notice" under Title IX could have been accomplished in either of two ways. First, and most obviously, the players could show that an appropriate person knew that Meeks-Rydell was sexually harassing them. *See J.F.K. v. Troup Cnty. Sch. Dist.*, 678 F.3d 1254, 1260 (11th Cir. 2012). Second, the players could demonstrate that an appropriate person knew that Meeks-Rydell was sexually harassing *other students* in a manner sufficient to alert that person of the possibility that she might also be sexually harassing the players. *See id.* In either case, "lesser harassment may still provide actual notice of sexually violent conduct." *Broward*,

---

The players' reliance on *Wilborn v. Southern Union State Community College*, 720 F. Supp. 2d 1274 (M.D. Ala. 2010), is similarly misplaced. To the extent the decision there can be understood to hold that a low-level employee can be an appropriate person if she is designated to receive complaints and has an obligation to forward them to those with authority to act, it contravenes the rule that Title IX requires actual, rather than constructive, notice to an official with authority to take corrective action. *See Gebser*, 524 U.S. at 285, 290; *see also Ross v. Univ. of Tulsa*, 859 F.3d 1280, 1289–90 (10th Cir. 2017) (holding that one who "merely pass[es] on a report of sexual harassment to someone authorized to take corrective action" cannot be an appropriate person).

604 F.3d at 1258.  "[L]esser harassment" includes actions like grop-ing, inappropriate touchings that couldn't be accidental, and mak-ing "'lewd suggestions.'"  *Id.* at 1258–59 (quoting *Williams v. Board of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282, 1290 (11th Cir. 2007)).  But it doesn't include "minimal and far afield" conduct such as making "sexually suggestive comments during class" or touch-ings in a context that "may have been appropriate or accidental, such as [at] an athletic event."  *Id.* at 1258 (citing *Gebser*, 524 U.S. at 291, and *Davis v. DeKalb Cnty. Sch. Dist.*, 233 F.3d 1367, 1373 (11th Cir. 2000)).  Importantly, the plaintiff needn't herself be the one to provide the notice.  *See id.* at 1257.

The players allege seven ways in which they say an appropri-ate person had actual notice:

1.  *First*, Chilcoat and Gandolfo witnessed Meeks-Rydell's har-assment on an ongoing basis.  Third Am. Compl. ¶¶ 61, 179–81.

2.  *Second*, the University knew or should have known about Meeks-Rydell's reputation for "engaging in sexual harass-ment" in a previous job.  *Id.* ¶¶ 168–69.

3.  *Third*, Johnson's mother gave Frisbey notice of Meeks-Ry-dell's abuse in February 2019 by complaining to him about "highly concerning and improper practices."[6]  *Id.* ¶¶ 135–36.

---

[6] In their brief, the players claim that this report was to Erdmann, *see* Br. of Appellants at 34–35, but their complaint indicates that the report was made to Frisbey, *see* Third Am. Compl. ¶¶ 135–36.

14                    Opinion of the Court                    23-11670

4.    *Fourth*, Moore admitted knowledge of the abuse in a January 2020 meeting when he pressured Tipping to write a letter to the NCAA "stating that she was leaving the University due to concerns about fires in Australia rather than the physical, emotional, and sexual abuse and harassment she suffered" at the hands of Meeks-Rydell.  *Id.* ¶ 93.

5.    *Fifth*, Maddux and Soboleski gave Erdmann and Frisbey notice in December 2020 about Meeks-Rydell's "physical, emotional, and sexual" abuse.  *Id.* ¶ 152.

6.    *Sixth*, Kazee and her parents met with Frisbey and Meeks-Rydell in December 2020 to complain that the coaches had denied players medical attention and that Meeks-Rydell had engaged in other "inappropriate conduct."  *Id.* ¶ 125.

7.    *Seventh*, Soboleski gave Erdmann and Frisbey notice a second time in December 2020, telling them that Meeks-Rydell had summoned her to her hotel room several times for "sexual conduct"—including, in one instance, forcing Soboleski to lie in bed with her and telling Soboleski to "use her [] boobs as a pillow."  *Id.* ¶ 159.

The district court held that only the last report provided actual notice.  We agree.

To begin, no notice to either Chilcoat or Gandolfo (No. 1 above) could have sufficed because, as already explained, they were not "appropriate persons."

The reports of Johnson's mother (No. 3) and Kazee (No. 6) were also insufficient.  According to the complaint, those reports alleged only "inappropriate conduct" and "improper practices." *See id.* ¶¶ 125, 136.  Title IX requires an allegation of *sexual*

harassment—a generalized allegation of other misconduct, or even abuse, is not enough. *See Gebser*, 524 U.S. at 281. Neither of the allegations permits a reasonable inference of sexual harassment.

Save for Soboleski's second report—which we'll address separately—all the remaining reports fail *Iqbal*'s pleading requirements. Despite the considerable deference that courts give to facts alleged in a complaint at the motion-to-dismiss stage, conclusory statements—devoid of any factual support—aren't assumed to be true. *See Iqbal*, 556 U.S. at 678–79. The allegation concerning Meeks-Rydell's reputation at a previous university (No. 2) is illustrative. The complaint states only—and baldly—that the University knew or should have known about Meeks-Rydell's reputation for "engaging in sexual harassment" in a previous job—without stating, or even implying, who at the University had that knowledge. Third Am. Compl. ¶¶ 168–69. The complaint is no more specific regarding Soboleski's first report, which she provided with Maddux (No. 5), or Tipping's meeting with Moore (No. 4). It states only that Soboleski and Maddux complained about "sexual abuse[]" and that Moore pressured Tipping to pen the letter to cover up "sexual abuse and harassment."[7] *Id.* ¶¶ 93, 152. Given that the governing legal standard requires "actual notice of sexual

---

[7] In his partial dissent, Judge Jordan contends that the complaint's allegation regarding Tipping's meeting with Moore adequately alleges notice because we have to draw reasonable inferences from the complaint. *See* Jordan Op. at 2. But there aren't any reasonable inferences to be drawn from a mere threadbare recital of one of Title IX's elements. *See Iqbal*, 556 U.S. at 678–79.

16                    Opinion of the Court                    23-11670

harassment," *Broward*, 604 F.3d at 1254, the complaint's bare assertions are insufficient—they are simply conclusory legal statements not entitled to deference, *see Iqbal*, 556 U.S. at 678–79.[8]

Soboleski's second report (No. 7), by contrast, provided specific claims about specific sexual assaults—and provided it to appropriate persons, Erdmann and Frisbey. *See J.F.K.*, 678 F.3d at 1260. Accordingly, we will consider whether Erdmann and Frisbey exhibited "deliberate indifference" to the conduct alleged in that report.

### 3

A defendant exhibits deliberate indifference for Title IX purposes if his or her "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Broward*, 604 F.3d at 1259 (citation and quotation marks omitted). "[T]he deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 645 (1999) (citation omitted). The district court held that the University wasn't deliberately indifferent because Meeks-Rydell was placed on leave the month after Soboleski's December 2020 meeting with Erdmann and Frisbey, resigned the month after that, and the complaint didn't allege any further contact between

---

[8] The December 2020 reports of Maddux and Soboleski (No. 5) and Kazee (No. 6) also fail to establish Title IX liability because, as explained below, neither Erdmann nor Frisbey exhibited deliberate indifference in responding to those reports. *See infra* at 16–17.

Meeks-Rydell and the players following Soboleski's meeting. Before us, the players don't dispute the district court's holding in that respect but, rather, argue that an appropriate person at the University was put on notice earlier. But for reasons already explained, only Soboleski's December 2020 report provided actual notice to an appropriate person of any Title IX-triggering conduct. And we agree with the district court that the University was not deliberately indifferent in its response to that notice.

\* \* \*

For the foregoing reasons, we affirm the district court's dismissal of the players' Title IX claims for failure to state a claim.

## B

To state a claim under 42 U.S.C. § 1983, a plaintiff must (1) "allege the violation of a right secured by the Constitution and laws of the United States" and (2) "show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Here, the players have asserted violations of their Fourteenth Amendment "substantive due process" rights. The parties quibble over whether the underlying right is an "interest in [] bodily integrity," which is said to include a right against "sexual harassment and excessive corporal punishment," or, instead, a "right to be free from unwanted touching by a college coach." *See* Order Granting Mot. to Dismiss 43–44, 52, Doc. 74; Br. of Appellee Meeks-Rydell 24; Reply Br. 13. Regardless of the interest claimed, though, the test for whether "executive action" violates substantive due process—as opposed to legislative action of

the sort clearly not at issue here—is whether it "'shocks the conscience.'" *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952)); *see id.* ("[The] criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue."); *see also Nix v. Franklin Cnty. Sch. Dist.*, 311 F.3d 1373, 1375 (11th Cir. 2002) ("As a general rule, to prevail on a claim of a substantive due-process violation" involving executive action, "a plaintiff must prove that a defendant's conduct 'shocks the conscience.'" (citation omitted)).

Of course, a plaintiff suing under § 1983 must also overcome qualified immunity. In a qualified-immunity analysis, the public official "'must first prove that [s]he was acting within the scope of [her] discretionary authority when the allegedly wrongful acts occurred.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). Then, "the burden shifts to the plaintiff" to show "a constitutional violation" that is "clearly established." *Id.* (citations and quotation marks omitted). "A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009) (citations omitted).

Applying these standards, the district court held (1) that the players failed to state a claim under § 1983 because the defendants' actions were not "conscience-shocking," and (2) regardless, that the players hadn't shown that the law was sufficiently clearly established to overcome qualified immunity. The players acknowledge that the University employees were acting within the scope of their discretionary authority, but they insist that they nevertheless violated clearly established law. We needn't address the merits of the players' § 1983 claim because we conclude that the players haven't shown that any University employee's conduct violated clearly established substantive-due-process principles. We therefore hold that they are entitled to qualified immunity.[9]

## 1

The players haven't provided any "case law with indistinguishable facts clearly establishing the constitutional right." *Lewis*, 561 F.3d at 1291–92. Indeed, at oral argument, the players conceded that they aren't proceeding on that first path. *See* Oral Arg.

---

[9] Erdmann, Frisbey, and Moore aren't subject to supervisory liability, either. Supervisory liability can arise only "(1) when a 'history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so' or (2) when a supervisor's 'improper custom or policy results in deliberate indifference to constitutional rights.'" *Broward*, 604 F.3d at 1266 (quoting *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)). As already explained, the players haven't sufficiently pleaded that Erdmann, Frisbey, or Moore knew of widespread abuse in Meeks-Rydell's past, nor have they made any attempt to plead a custom or policy that led to Meeks-Rydell's misconduct.

20                    Opinion of the Court                    23-11670

at 37:30–38:03. And with good reason. While many of the players' allegations are serious and, if true, may well indicate violations of state law, the bar set by our substantive-due-process precedent is very high—far too high, at the very least, to clearly establish the unconstitutionality of Meeks-Rydell's alleged conduct.

Consider first the players' allegations regarding Meeks-Rydell's, Chilcoat's, and Gandolfo's *non-sexual* conduct—*e.g.*, forcing them to play through injuries, denying them medical care and access to inhalers, slapping them, and spiking volleyballs toward their faces. Far from supporting the players' position, our most factually analogous precedents tend to undermine it, and in any event don't clearly establish the law in the players' favor. *See, e.g., Davis v. Carter*, 555 F.3d 979, 984 (11th Cir. 2009) (holding that a coach's actions didn't shock the conscience when he ignored a player's physical struggles during a workout session, even where the player eventually collapsed and died); *T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cnty.*, 610 F.3d 588, 599 (11th Cir. 2010) (finding it "inconceivable" that a teacher's conduct in intentionally tripping a developmentally disordered student and causing him to stumble would shock the conscience). We haven't found conscience-shocking behavior in any remotely similar case in the absence of a serious injury of the sort that is lacking here. *See, e.g., Neal ex rel. Neal v. Fulton Cnty. Bd. of Educ.*, 229 F.3d 1069, 1076 (11th Cir. 2000) (holding that a plaintiff stated a claim for conscience-shocking behavior where he alleged that a coach struck a student in the face with a weight lock, knocking his eyeball out of its socket and causing permanent blindness); *Kirkland ex rel. Jones v. Greene Cnty. Bd. of Educ.*, 347 F.3d 903, 904–05

(11th Cir. 2003) (holding that a plaintiff's allegations of conscience-shocking behavior survived summary judgment where a teacher repeatedly struck a child in the ribs, back, and head with a metal cane, causing continuing migraines).

Nor are there any factually analogous decisions that clearly established the unconstitutionality of Meeks-Rydell's alleged *sexual* misconduct—*e.g.*, the hotel-related incidents, kissing her players, and engaging in "floor hugs." Again, it may well be that Meeks-Rydell's actions violated some state law, but no precedent to which we have been pointed—or that we have found—reveals a clear violation of the players' substantive-due-process rights. *See, e.g., Skinner v. City of Miami*, 62 F.3d 344, 348 (11th Cir. 1995) (holding that a firefighter failed to prove conscience-shocking behavior where several of his colleagues handcuffed him while another rubbed his scrotum on top of the victim's head in a hazing ritual).

## 2

This is also not a case in which a "broad statement of principle within the Constitution, statute, or case law . . . clearly establishes a constitutional right." *Lewis*, 561 F.3d at 1292. We have explained that a qualifying "broad statement" cannot be "too general" and must "put every reasonable officer" on notice that it "'clearly prohibit[s] the officer's conduct in the particular circumstances before him.'" *Baxter v. Roberts*, 54 F.4th 1241, 1268 (11th Cir. 2022) (alteration in original) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). For example, in the First Amendment context, we have held that the rules against viewpoint discrimination

and allowing licensing authorities to exercise unbridled discretion constitute the kinds of broad principles capable of clearly establishing the law for qualified-immunity purposes. *See Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1324–26 (11th Cir. 2024).

We have nothing of the sort here. With respect to the allegations of non-sexual corporal punishment, the players point to *Neal* as ostensibly establishing a qualifying broad statement of principle. That is incorrect. To the contrary, *Neal* focuses on what kinds of facts are relevant, notes that there are objective and subjective components of the shocks-the-conscience analysis, and considers three factors in a "totality of the circumstances" test. 229 F.3d at 1075–76 & n.3. These may be helpful guideposts bearing on the analysis of allegedly conscience-shocking behavior on the merits, but they don't—and don't even purport to—establish a "broad statement of principle." *Lewis*, 561 F.3d at 1292. And with respect to the allegations of sexual misconduct, the players don't point to any cases clearly establishing a relevant "broad statement," nor are we aware of any.

**3**

Finally, the players' allegations don't rise to the level of "conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis*, 561 F.3d at 1292. "This method is reserved for 'extreme circumstances' presenting 'particularly egregious facts' that would have put any reasonable officer on notice that his actions 'offended the Constitution.'" *Baxter*, 54 F.4th at 1268 (quoting *Taylor v. Riojas*, 592 U.S. 7, 8–9 (2020)). So-

called "obvious clarity" cases are few and far between, and they invariably deal with conduct that is beyond any reasonable pale. *See, e.g.*, *Taylor*, 592 U.S. at 8–9 (leaving inmate for six days in a cell covered "nearly floor to ceiling" in feces and in another cell that was "frigidly cold" and had only a clogged drain in the floor to dispose of bodily wastes); *Hope v. Pelzer*, 536 U.S. 730, 733–35 (2002) (handcuffing inmate to "hitching post" for seven hours in the hot sun with no bathroom breaks and very little water); *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002) (slamming arrestee's head against the trunk of her car after she had been "arrested, handcuffed, and completely secured"). The conduct alleged here, while most regrettable, isn't in that universe.

\* \* \*

For the foregoing reasons, we affirm the district court's dismissal of the players' § 1983 claims on qualified-immunity grounds.

## III

We **AFFIRM** the district court's order dismissing the players' Title IX claims and § 1983 claims.

23-11670          Jordan, J., Dissenting in Part                    1

JORDAN, Circuit Judge, Concurring in Part and Dissenting in Part:

I join Judge Newsom's opinion for the court except with respect to the Title IX claim of Caitlin Tipping, as to which I respectfully dissent. In my view, Ms. Tipping sufficiently (i.e., plausibly) alleged notice to an "appropriate person"—Associate Athletic Director Chris Moore.

The operative complaint alleges that Coach Alexis Meeks-Rydell sexually harassed Ms. Tipping. This harassment included "butt pinching" and "forced hugs" by Coach Meeks-Rydell. In addition, Coach Meeks-Rydell "forced" Ms. Tipping into telling her "I love you." *See* Third Am. Compl. at 21 ¶ 85.

On the issue of notice, the complaint alleges that, after Ms. Tipping was forced to leave the University and its volleyball team due to the sexual harassment and abusive conduct, Coach Meeks-Rydell and Associate Athletic Director Moore scheduled a meeting with her in January of 2020. *See id.* at 22 ¶¶ 90–91. At that meeting, Coach Meeks-Rydell and Associate Athletic Director Moore sought to intimidate Ms. Tipping by falsely telling her she would be subject to a $6,000 fine for leaving the University. *See id.* at 22 ¶ 92. Then, in "order to perpetuate the physical and emotional abuse and sexual harassment and conceal . . . such wrongful and illegal conduct from the NCAA," Coach Meeks-Rydell and Associate Athletic Director Moore convinced Ms. Tipping they could take care of the falsely manufactured fine if she wrote a letter saying she was leaving the University due to concerns in Australia "rather than the

physical, emotional, and sexual abuse and harassment she suffered." *Id.* at 22 ¶ 93. As a result of this coercion, Ms. Tipping provided the requested letter. *See id.* at 23 ¶ 94.

From my perspective, Ms. Tipping has plausibly alleged that Associate Athletic Director Moore (an "appropriate person" for Title IX purposes) had "actual knowledge of discrimination in the [University's] programs and failed adequately to respond." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). As alleged, Associate Athletic Director Moore, together with Coach Meeks-Rydell—the alleged harasser—made up a story about a $6,000 fine in order to hide from the NCAA the physical and emotional abuse *and* sexual harassment Ms. Tipping suffered. A "complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations[.]" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). And we have to draw reasonable inferences from the complaint at the motion-to-dismiss stage. *See Worthy v. City of Phenix City, Ala.*, 930 F.3d 1206, 1214 (11th Cir. 2019). Persons in the positions of Coach Meeks-Rydell and Associate Athletic Director Moore would not manufacture the threat of a $6,000 fine unless there was something they wished to hide, and the complaint alleges that one of these things was Coach Meeks-Rydell's sexual harassment of Ms. Tipping.

I join the court's opinion except as it relates to Ms. Tipping's Title IX claim.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

April 10, 2025

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  23-11670-GG
Case Style:  Rachael DeMarcus, et al v. University of South Alabama, et al
District Court Docket No:  1:21-cv-00380-KD-B

Opinion Issued
Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP 41(b).

Petitions for Rehearing
The time for filing a petition for panel rehearing or rehearing en banc is governed by 11th Cir. R. 40-2. Please see FRAP 40 and the accompanying circuit rules for information concerning petitions for rehearing. Among other things, **a petition for rehearing must include a Certificate of Interested Persons**. See 11th Cir. R. 40-3.

Costs
Costs are taxed against Appellant(s) / Petitioner(s).

Bill of Costs
If costs are taxed, please use the most recent version of the Bill of Costs form available on the Court's website at www.ca11.uscourts.gov. For more information regarding costs, see FRAP 39 and 11th Cir. R. 39-1.

Attorney's Fees
The time to file and required documentation for an application for attorney's fees and any objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

Appointed Counsel
Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation via the eVoucher system no later than 45 days after issuance of the mandate or the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

<u>Clerk's Office Phone Numbers</u>

| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

OPIN-1 Ntc of Issuance of Opinion